DEILY, MOONEY & GLASTETTER, LLP
8 Thurlow Terrace
Albany, New York 12203
(518) 436-0344
Jason A. Little, Esq. (JL7573)

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In Re:<br><br>JULIAN SALIM,<br><br>               Debtor. | Case No. 13-42974 (ess)<br>(Chapter 7) |
| VW CREDIT, INC.<br><br>               Plaintiff,<br><br>v.<br><br>JULIAN SALIM<br><br>               Defendant. | Adv. Proc. No. |

## **COMPLAINT TO DETERMINE NONDISCHARGEABILITY OF DEBT AND DENY DEFENDANT A DISCHARGE**

VW Credit, Inc. ("VCI"), a creditor in the above-captioned bankruptcy case, by its counsel, Deily, Mooney & Glastetter, LLP, as and for its adversary complaint to determine the dischargeability of Defendant Julian Salim's ("Defendant") debt to VCI and to determine Defendant's debt to be non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(4) and (6), hereby states as follows:

      1.    The Court has jurisdiction to hear this Complaint pursuant to 28 U.S.C. §§ 157(a), (b)(2)(i) and 11 U.S.C. § 523(c).

2. Defendant filed his bankruptcy petition under Chapter 7 of Title 11 of the United States Code with the United States Bankruptcy Court for the Eastern District of New York on May 15, 2013 ("Petition"). (Case No. 13-42974 Doc. No. 1 ("Doc. No.")).

3. VCI is a creditor of Defendant by virtue of Defendant guarantying all of Big Apple Volkswagen, LLC ("Big Apple") obligations to VCI pursuant to a certain Wholesale Loan Agreement and Capital Loan Agreement between VCI and Big Apple, which are more specifically described below.

4. Defendant lists VCI as an unsecured creditor on Schedule F of Defendant's Petition in the amount of $1,146,758.00 for "[p]ersonal [l]iability on debt to debtor's failed car dealership called Big Apple Volks Wagon." (Doc. No. 1 [Schedule F]). As detailed below, VCI's claim against Defendant exceeds the amount listed in the Petition.

### A. Relevant Agreements Between VCI, Defendant and Big Apple

5. Big Apple owned and operated a new and used car dealership in the Bronx, New York as a franchisee of Volkswagen of America.

6. At all times relevant herein, Defendant was the President, Managing Member and majority owner of Big Apple.

7. Big Apple, for value received, executed a certain Promissory Note dated June 12, 2006, in the face amount of $3,347,500.00, (the "Wholesale Note") and that certain Master Security Agreement dated June 12, 2006, (collectively, with the Wholesale Note, the "Wholesale Loan Agreement"), under the terms of which it promised, among other things, to repay sums loaned to it by VCI. A true and accurate copy of the Wholesale Loan Agreement is attached hereto as **Exhibit "A"**.

8.  Pursuant to the terms of the Wholesale Agreement, Big Apple agreed to pay VCI the sum of $3,347,500.00, or such sum as might be outstanding thereunder, on demand, with interest thereon at the rate specified in the Wholesale Agreement.  Principal and interest payments were otherwise to be made as called for under the Wholesale Agreement, until paid. See **Exhibit "A"**.

9.  Pursuant to the Wholesale Agreement, VCI extended wholesale financing to Big Apple for its purchase of automobiles to be held as inventory for Big Apple for resale or lease at retail.  Big Apple agreed that all sums owing for each such vehicle sold or leased by Big Apple would be promptly and faithfully paid to VCI, and agreed that upon the sale or lease of any vehicle by Big Apple, Big Apple would remit to VCI the total amount then outstanding on VCI's advance on each such vehicle sold or leased.  See **Exhibit "A"**.

10.  The Wholesale Loan Agreement also provides VCI a security interest:

> . . . in each and every Vehicle financed hereunder, whether now owned or hereinafter acquired by way of replacement, substitution, addition or otherwise, together with all accessions thereto and all proceeds thereof, as security for each and every indebtedness and obligation of the Debtor hereunder, including without limitation each and every indebtedness and obligation of Debtor under the Promissory Notes, any costs and expenses incurred by [VCI] in the collection or enforcement of the said Promissory Notes . . . and as security for each and every other indebtedness and obligation now or hereafter owing by Debtor to [VCI], including without limitation any collection or the cost of enforcing the terms of this Agreement, including reasonable attorneys' fees . . . .
>
> Further, Debtor also grants to [VCI] a security interest in and to all inventory not otherwise subject to any such security Interest aforesaid in favor of [VCI], whether or not financed by [VCI], including without limitation all inventory of new and used motor vehicles, campers, travel trailers, mobile homes and motor homes, and all inventory of automotive parts and accessories, whether now owned or hereinafter acquired by way of replacement, substitution, addition or otherwise, together with all additions and accessions thereto and all proceeds thereof.

> Further, Debtor also grants to [VCI] a security interest in and to all Chattel Paper, Accounts whether or not earned by performance and including without limitation all amounts due from the manufacturer or distributor of the Vehicles or any of their subsidiaries or affiliates, Contract Rights, Documents, Instruments, General Intangibles, Consumer Goods, Equipment, Fixtures and Leasehold Improvements, whether now owned or hereafter acquired by way of replacement, substitution, addition or otherwise, together with all additions and accessions thereto and all proceeds thereof, as additional security for each and every indebtedness and obligation of Debtor as set forth above . . . .

**Exhibit "A"** at ¶ 5.

11.  Big Apple, for value received, also executed and delivered a Promissory Note dated March 19, 2007, in the principal amount of $250,000.00 (the "Capital Note"), and a related Master Security Agreement dated March 19, 2007 (the "Capital Master Security Agreement"), for a loan made by VCI to Big Apple. Hereinafter, the Capital Loan Note and the Capital Master Security Agreement are referred to as the "Capital Loan Agreement." The Capital Loan Agreement is attached hereto as **Exhibit "B"**.

12.  Pursuant to the terms of the Capital Loan Agreement, Big Apple agreed to pay VCI all sums loaned thereunder, with interest thereon at the rate specified in the Capital Loan Agreement.

13.  The Capital Loan Agreement, pursuant to its terms, also provides, as security for the prompt and complete payment and performance when due, a security interest in all of Big Apple's right, title and interest in, to and under the list of now owned or after acquired collateral as provided for therein. **Exhibit "B"** at ¶ 3.1(a)-(d).

14.  The Capital Loan Agreement, pursuant to its terms, also provides specifically for cross-collateralization and cross rights to declare a default, whereby all Collateral is security for all Obligations. **Exhibit "B"** at ¶ 2.3.

15. To secure all of Big Apple's obligations to VCI under the Wholesale Loan Agreement and Capital Loan Agreement, Defendant, in addition to two other principals of Big Apple, executed a Continuing Guaranty on October 29, 2008 ("Guaranty"). The Guaranty, by its terms, renders Defendant the primary guarantor under the Wholesale Loan Agreement and Capital Loan Agreement. A true and accurate copy of the Guaranty is attached hereto as **Exhibit "C"**.

16. The Wholesale Loan Agreement and Capital Loan Agreement are cross-defaulted, that is any default under one constitutes a default under the other. See **Exhibits "A"** and **"B"**.

17. VCI has complied with all of its obligations under the Wholesale Loan Agreement and Capital Loan Agreement by advancing the monies described therein and providing wholesale floorplan financing to Big Apple through which Big Apple acquired, among other things, its entire vehicle inventory. Big Apple, however, defaulted under the terms of the Wholesale Loan Agreement by, among other things, selling more than 78 vehicles with a wholesale value of more than $1.2 million without making payment to VCI for the sales. This practice is commonly known in the automobile finance industry as selling out of trust ("SOT").

  **B.**   **VCI Learns of Big Apple's SOT**

18. On or about March 3, 2011, VCI was notified by a mutual vendor, JM&A, that Big Apple was four (4) months past due on its account with JM&A.

19. On March 11, 2011, VCI sent an audit team to Big Apple, in an attempt to determine the status of Big Apple's automobile inventory, which constitutes collateral under Big Apple's Loan Agreement with VCI.

20. Upon arriving at Big Apple, VCI's audit team was turned away by Big Apple management and told to return any time during the week of March 13, 2011.

21. On March 15, 2011, VCI received information from reliable sources that Big Apple was conducting a secret liquidation of its inventory, in violation of the Loan Agreement.

22. On March 15, 2011, the VCI audit team returned to Big Apple and conducted an audit at the dealership.

23. As a result of the audit, and by March 16, 2011, VCI discovered that, in violation of the terms and conditions of the Wholesale Loan Agreement, Big Apple sold seventy eight (78) vehicles from its inventory, and failed and refused to remit payments to VCI, as required by the Loan Agreement, in the amount of $1,237,615.86.

24. Upon VCI's discovery of the SOT, Big Apple did provide VCI with documentation regarding the sale of some of the missing vehicles, but Big Apple prohibited VCI from examining the books and records and from performing a bank cut-off and other audit functions to determine the status of the proceeds of VCI's collateral, as allowed by the Loan Agreement.

25. Thereafter, VCI personnel were barred from Big Apple.

26. As detailed below, VCI eventually learned that during the time of the above referenced audit, of March 14, 2011 and March 15, 2011 Defendant transferred approximately $1.2 million from Big Apple's Wachovia Funding Account to family members, the amounts of which are very nearly equal the $1,237,615.86 SOT discovered by VCI on March 15, 2011.

    **C.**     <u>**VCI's District Court Action**</u>

27. On March 21, 2011, VCI initiated a suit against, in part, Defendant for Big Apple's breach of the Wholesale Loan Agreement, Capital Loan Agreement, Guaranty and further seeking replevin of its collateral in the United States District Court for the Southern District of New York (Index No. 11-cv-07950).

28. On March 22, 2011, VCI obtained an Order temporarily restraining and prohibiting Big Apple from conducting any business or paying its employees pending a hearing scheduled for April 1, 2011. This action was stayed after Big Apple filed for bankruptcy protection as detailed below.

29. On November 29, 2012, the District Court issued an Order directing the Clerk of Court to enter judgment in favor of VCI against, in part, Defendant, in the amount of $1,146,758.11. A true and accurate copy of the November 29, 2012 Order is attached hereto as **Exhibit "D"**.

### D. Relevant Big Apple Bankruptcy Proceeding and Factual Allegations Entitling VCI to a Non-Dischargeable Judgment Against Defendant

30. On March 30, 2011, Big Apple filed a voluntary bankruptcy petition under Chapter 11 of Title 11 of the Bankruptcy Code, Case. No. 11-11388 (JMP) ("Big Apple Petition").

31. Subsequent to the Big Apple Petition, on April 5, 2011, the United States Bankruptcy Court for the Southern District of New York, by Hon. James M. Peck, issued a Temporary Cash Collateral Order, the terms of which ordered Big Apple to make full and transparent disclosure to VCI of its financial affairs. Specifically, under the April 5, 2011 Order and Hon. James M. Peck's March 31, 2011 order from the bench, VCI was to receive information from Big Apple concerning its use of VCI's cash collateral, and VCI was permitted to review Big Apple's financial books and records.

32. Big Apple failed to meaningfully comply with the above referenced orders and had initially failed to turn over any meaningful documentation and denied or complicated VCI's access to the Big Apple dealership.

33. During this time period, Defendant was one of Big Apple's principals who received and participated in communications with VCI regarding the above referenced deficiencies, among others, however, Big Apple's principals advised VCI that it had "no more' documents to produce and that Big Apple planned to "sue" VCI.

34. In all, as of April 12, 2011, Big Apple had produced no documents from which VCI could trace the proceeds of its collateral that Big Apple has sold out of trust, or evaluate Big Apple's financial condition.

35. On April 20, 2011, for the first time, Big Apple provided to VCI the March, 2011 bank statement for the following: Wachovia Funding Account *********7695.

36. Big Apple did not produce documents showing the details of, payee/use of funds, and reasons for any withdrawals/transfers out of the account, including:

`          3/14/2011: $718,000.00 counter withdraw;

3/15/2011: $504,271.14 – transfer to *********8157 (CCSC:C 85682).

37. VCI followed up with Big Apple's counsel on several occasions after the discovery of the above referenced withdrawal/transfer, but those efforts did not turn up documentation regarding the payee/use of funds.

38. The withdrawal and transfer amounts very nearly equal the $1,237,615.86 SOT discovered by VCI on March 15, 2011.

39. As a result, in part, of the withdrawal/transfer, on April 13, 2011 VCI filed a motion seeking to have a Chapter 11 Trustee ("Trustee") appointed for Big Apple pursuant to 11 U.S.C. § 1104(a) and Bankruptcy Rules 2007 and 9014. Over the objection of Big Apple, and after a hearing on May 3, 2011, the Court entered an Order directing the appointment of Trustee.

40. On May 2, 2011, Big Apple filed a Statement of Financial Affairs, in which it reported that in March, 2011, it had made the above referenced transfers/withdrawals in the amounts of $781,000.00 and $485,000.00 to Defendant's mother and brother-in-law respectively. Defendant later clarified that the transfer/withdrawal to his mother actually amounted to $718,000.00, which comports with Big Apple's March, 2011 Wachovia Funding Account Bank Statement.

41. Upon information and belief, Defendant used SOT proceeds rightfully belonging to VCI to fund the withdrawal/transfer to his mother and brother-in-law.

42. At no time did VCI authorize the withdrawal/transfer of the amounts described above.

43. On March 15, 2011, the very next day after the $718,000.00 withdrawal described above, $504,271.14 was electronically transferred from Big Apple's Wachovia commercial checking account. Big Apple acknowledged that these funds were transferred by Defendant to his brother-in-law in Syria and described the transfer as "an investment."

44. Thus, within three weeks prior to the Big Apple Petition, Defendant transferred at least $1.2 million from Big Apple to members of his family. The transferred amounts very nearly equal the $1,237,615.86 SOT discovered by VCI on March 15, 2011.

45. Upon the Trustee taking over the operations of Big Apple, it was ultimately determined that the operations were not generating sufficient revenue to pay Big Apple's obligations, including debt service to VCI, and Trustee made a motion on June 27, 2011 for an order approving sale procedures and terms for Big Apple. The Court entered an Order approving the sale procedure and terms sought on July 13, 2011.

46.     In compliance with the procedures and terms set forth in the sale order, the Trustee selected the highest or best offer of $930,000.00. The sale was ultimately approved by the Court on October 7, 2011 and closed on November 7, 2011.

47.     On October 13, 2011, Trustee and VCI entered into a Stipulation deeming VCI's claims in the Big Apple Bankruptcy to be secured by valid and properly perfected first priority liens on all of [Big Apple's] assets, including the dealership assets and which also authorized Trustee to pay VCI the proceeds of the sale, net of closing adjustments and outstanding expenses. The Stipulation was "So Ordered" by the Court on December 20, 2011. A true and accurate copy of the December 20, 2011 Stipulation and Order is attached hereto as **Exhibit "E"**.

48.     The net proceeds of the sale were ultimately provided to VCI and credited to its secured claim, however, additional amounts remain due and owing.

49.     As of November 27, 2012, the date VCI obtained judgment against Defendant, the amount due and owing to VCI totaled $1,146,758.11. See **Exhibit "D"**.

50.     As a result of the foregoing, and upon information and belief, Defendant converted VCI's collateral, and the proceeds thereof, willfully and maliciously to his own benefit by transferring the SOT amounts to family members without VCI's knowledge or consent, and in knowing violation of the Wholesale Loan Agreement and Capital Loan Agreement between the parties.

51.     Upon information and belief, Defendant converted the funds from the sale of the VCI's collateral, which rightfully belong to VCI, with the willful and malicious intention of depriving VCI of the proceeds of its collateral.

52. Defendant acted with malice, ill will and fraudulent intent to deprive VCI of its collateral and the proceeds thereof.

53. Defendant's failure to remit the remaining amounts due which, in part, include SOT amounts, constitutes a fraud and/or defalcation while acting in a fiduciary capacity and larceny within the meaning of 11 U.S.C. § 523(a)(4).

54. For the reasons stated above, VCI's claim is non-dischargeable pursuant to 11 U.S.C. § 523(a)(4) and (a)(6).

### AS AND FOR ITS FIRST CAUSE OF ACTION VCI ALLEGES DEBT SHOULD NOT BE DISCHARGED UNDER 11 U.S.C. § 523(a)(4)

55. VCI repeats, restates, reiterates and re-alleges each and every allegation contained in paragraphs 1-54 and incorporates the same as though fully set forth herein.

56. Pursuant to its terms, the June 12, 2006 Wholesale Loan Agreement provides in pertinent part at paragraph 4:

> Debtor agrees to hold in trust for [VCI] and shall forthwith remit to Secured Party, to the extent of any unpaid and past due Indebtedness hereunder, all proceeds of each remaining Vehicle when received by Debtor, or to allow [VCI] to make direct collection thereof and credit Debtor with all sums received by [VCI].

57. As provided for above, Big Apple sold seventy eight (78) vehicles out of trust from its inventory, and failed and refused to remit payments to VCI, as required by the Wholesale Loan Agreement in defalcation of its fiduciary responsibility to VCI.

58. Defendant, thereafter, made withdrawal/transfer of approximately $1.2 million to his mother and brother-in-law from Big Apple's Wachovia Funding account on March 14, and March 15, 2011. The amount of the withdrawal/transfer very nearly equals the $1,237,615.86 SOT discovered by VCI on March 15, 2011.

59.     Based upon the facts, circumstances, and series of transactions as set for the above, Defendant's acts and omissions constitute fraud or defalcation while acting in a fiduciary capacity, embezzlement and/or larceny.

### AS AND FOR ITS SECOND CAUSE OF ACTION VCI ALLEGES
### DEBT SHOULD NOT BE DISCHARGED UNDER 11 U.S.C. § 523(a)(6)

60.     VCI repeats, restates, reiterates and re-alleges each and every allegation contained in paragraphs 1-56 and incorporates the same as though fully set forth herein.

61.     Based upon the facts, circumstances, and series of transactions as set for the above, Defendant's acts and omissions were done willfully and maliciously to injure VCI and its property.

**WHEREFORE**, Plaintiff VW Credit, Inc. prays that this honorable Court order a non-dischargeable judgment against Defendant, Julian Salim and for such other and further relief as the Court may deem just and proper.

Dated:  Albany, New York
         August 20, 2013                        DEILY, MOONEY & GLASTETTER, LLP

                                        By:    /s/ Jason A. Little
                                               Jason A. Little, Esq. (JL7573)
                                               Jonathan D. Deily, Esq. (JD3579)
                                               *Attorney for VW Credit, Inc.*
                                               8 Thurlow Terrace
                                               Albany, New York 12203
                                               Tel: (518) 436-0344
                                               Email: jlittle@deilylawfirm.com
                                                      jdeily@deilylawfirm.com