DEILY & GLASTETTER, LLP
8 Thurlow Terrace
Albany, New York 12203
(518) 436-0344
Jason A. Little, Esq. (JL7573)

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| In Re:<br><br>JULIAN SALIM,<br><br>Debtor. | Case No. 13-42974 (ess)<br>(Chapter 7) |
| VW CREDIT, INC.<br><br>Plaintiff,<br><br>v.<br><br>JULIAN SALIM<br><br>Defendant. | Adv. Proc. No. 13-01442 (ess) |

**AFFIDAVIT IN SUPPORT OF VW CREDIT, INC.'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. BANKR. P. 7056 AND FED. R. CIV. P. 56**

STATE OF VIRGINIA     )
                                          )
COUNTY OF FAIRFAX  ) ss.:

I, Crystal Jeffrey-Alexander, of full age, certify to the following:

1. I am the Commercial Credit Senior Manager with Risk Management oversight responsibilities for the VCI Eastern Region of VW Credit, Inc. ("VCI"). I was previously VCI's Northeast Region Risk Manager. In these capacities I am and was responsible for overseeing the

credit relationship between VCI and Defendant Julian Salim's company, Big Apple Volkswagen LLC ("Big Apple").

2. This Affidavit is submitted in support of VCI's motion for summary judgment against Defendant, Julian Salim ("Defendant") seeking a determination that the full judgment amount owed to VCI by Defendant be determined non-dischargeable under 11 U.S.C. §§ 523(a)(4) and (6).

3. As part of my employment with VCI, I had and have personal responsibility for the management of Big Apple's accounts. I am one of the custodians of the books, records, and files of VCI as they pertain to Big Apple's obligations (the books, records and files of VCI are kept under my supervision). I have personally worked on VCI's books, records, and files and, as to the following facts, I know them to be true to my own knowledge or have gained knowledge of them from VCI's books, records, and files. The information recorded in VCI's books, records and files were recorded in the ordinary course of VCI's business at or about the time of the incidents referred to in the records, by a person who had personal knowledge of the event being recorded and has or had a business duty to accurately record such information.

4. I have personal knowledge of the facts set forth in this Affidavit and, if called as a witness, I could and would testify competently as to those facts.

### FACTUAL ALLEGATIONS IN SUPPORT OF VCI'S MOTION FOR SUMMARY JUDGMENT

5. VCI is a Delaware corporation, with its principal place of business in the State of Virginia, and is authorized to do business in New York.

6. At all times relevant herein, Defendant Julian Salim ("Defendant") was the President, Managing Member and majority owner of Big Apple. See Adv. Doc. No. 1 at ¶ 6; Adv. Doc. No. 11; Fed. R. Bank. P. 7008; Fed. R. Civ. P. 8(a).

7. Big Apple owned and operated a new and used car dealership in the Bronx, New York as a franchisee of Volkswagen of America. Adv. Doc. No. 1 at ¶ 5; Adv. Doc. No. 11; Fed. R. Bank. P. 7008; Fed. R. Civ. P. 8(a).

8. VCI is a creditor of Defendant [1] by virtue of Defendant guarantying all of Big Apple's obligations to VCI pursuant to a certain Wholesale Loan Agreement and Capital Loan Agreement between VCI and Big Apple, which I will more specifically detail below, and which is subject to VCI's United States District Court for the Southern District of New York judgment against Defendant. Adv. Doc. No. 1 at ¶ 3; Adv. Doc. No. 11; Fed. R. Bank. P. 7008; Fed. R. Civ. P. 8(a).

### A. Relevant Agreements Between VCI, Defendant and Big Apple

9. Big Apple, for value received, executed a Promissory Note dated June 12, 2006, in the face amount of $3,347,500, and a Master Security Agreement dated June 12, 2006 (together, the "Wholesale Loan Agreement"), under the terms of which it promised, among other things, to repay sums loaned to it by VCI. A true and correct copy of the Wholesale Loan Agreement is attached hereto as **Exhibit 1**.

10. Pursuant to the Wholesale Loan Agreement, VCI extended wholesale financing to Big Apple for its purchase of automobiles to be held as inventory by Big Apple for resale or lease at retail. Big Apple agreed that all sums owing for each such vehicle sold or leased by Big Apple would be promptly and faithfully paid to VCI, and agreed that upon the sale or lease of any vehicle by Big Apple, Big Apple would remit to VCI the total amount then outstanding on VCI's advance on each such vehicle sold or leased. See **Exhibit 1**.

11. The Wholesale Loan Agreement also provides VCI a security interest:

---

[1] Defendant lists VCI as an unsecured creditor on Schedule F of Defendant's Petition in the amount of $1,146,758.00 for "[p]ersonal [l]iability on debt to debtor's failed car dealership called Big Apple Volks Wagon." (Doc. No. 1 [Schedule F]). VCI's claim exceeds the amount listed in Schedule F of Defendant's Petition.

1859107 (2)    3

> . . . in each and every Vehicle financed hereunder, whether now owned or hereinafter acquired by way of replacement, substitution, addition or otherwise, together with all accessions thereto and all proceeds thereof, as security for each and every indebtedness and obligation of the Debtor hereunder, including without limitation each and every indebtedness and obligation of Debtor under the Promissory Notes, any costs and expenses incurred by [VCI] in the collection or enforcement of the said Promissory Notes . . . and as security for each and every other indebtedness and obligation now or hereafter owing by Debtor to [VCI], including without limitation any collection or the cost of enforcing the terms of this Agreement, including reasonable attorneys' fees . . . .
>
> Further, Debtor also grants to [VCI] a security interest in and to all inventory not otherwise subject to any such security Interest aforesaid in favor of [VCI], whether or not financed by [VCI], including without limitation all inventory of new and used motor vehicles, campers, travel trailers, mobile homes and motor homes, and all inventory of automotive parts and accessories, whether now owned or hereinafter acquired by way of replacement, substitution, addition or otherwise, together with all additions and accessions thereto and all proceeds thereof.
>
> Further, Debtor also grants to [VCI] a security interest in and to all Chattel Paper, Accounts whether or not earned by performance and including without limitation all amounts due from the manufacturer or distributor of the Vehicles or any of their subsidiaries or affiliates, Contract Rights, Documents, Instruments, General Intangibles, Consumer Goods, Equipment, Fixtures and Leasehold Improvements, whether now owned or hereafter acquired by way of replacement, substitution, addition or otherwise, together with all additions and accessions thereto and all proceeds thereof, as additional security for each and every indebtedness and obligation of Debtor as set forth above . . . .

**Exhibit 1 at ¶ 5.**

12. Pursuant to the terms of the Wholesale Loan Agreement:

> [Big Apple] agrees that financing pursuant to this Agreement shall be used exclusively for the purpose of acquiring Vehicles for [Big Apple's] Inventory and [Big Apple] shall not sell or otherwise dispose of such Vehicles except by sale in the ordinary course of business. If so requested by [VCI], [Big Apple] agrees to maintain a separate bank account into which all cash proceeds of such sales or other dispositions of each such Vehicle will be deposited. [Big Apple] further agrees that each such Vehicle sold shall be promptly

1859107 (2)                                    4

> and fully paid off to [VCI] and upon such sale [Big Apple] will remit to [VCI] the total amount then outstanding of [VCI's] Advance on each such Vehicle.
>
> . . . [Big Apple] agrees to hold in trust for [VCI] and shall forthwith remit to [VCI], to the extent of any unpaid and past due Indebtedness hereunder, all proceeds of each remaining Vehicle when received by [Big Apple], or to allow [VCI] to make direct collection thereof and credit [Big Apple] with all sums received by [VCI] . . . .

Exhibit 1 at ¶ 4.

13. Big Apple also executed and delivered a Promissory Note dated March 19, 2007, in the principal amount of $250,000.00 and a related Master Security Agreement dated March 19, 2007 (together, the "Capital Loan Agreement"), for a loan made by VCI to Big Apple. A true and correct copy of the Capital Loan Agreement is attached hereto as **Exhibit 2**. VCI advanced the sum of $250,000.00 to Big Apple on or about the date of the Promissory Note.

14. Pursuant to the terms of the Capital Loan Agreement, Big Apple agreed to pay VCI all sums loaned thereunder, with interest thereon at the rate specified in the Capital Loan Agreement and at the times, specified in the Capital Loan Agreement.

15. The Capital Loan Agreement, pursuant to its terms, also provides, as security for the prompt and complete payment and performance when due, a security interest in all of Big Apple's right, title and interest in, to and under the list of now owned or after acquired collateral as provided for therein. See **Exhibit 2** at ¶ 3.1(a)-(d).

16. The Capital Loan Agreement, pursuant to its terms, provides specifically for cross-collateralization and cross rights to declare default, whereby all Collateral is security for all Obligations. See **Exhibit 2** at ¶ 2.3.

17. The Capital Loan Agreement specifically acknowledges that none of the assets of Big Apple's business is, as of the date thereof, subject to any mortgage, pledge, lien or

encumbrance in favor of anyone other than VCI. See **Exhibit 2** at ¶ 4.3. Moreover, Big Apple negatively covenanted that it would not, without the prior written consent of VCI:

> Create, permit or suffer to exist any mortgage, lien or other encumbrance to be levied upon or become a charge against [Big Apple's] Business or any of its properties, assets, operations, products, income, securities other than mortgage liens or other encumbrances in favor of VCI . . . .

See **Exhibit 2** at ¶ 6.2.

18. The Capital Loan Agreement provides that Big Apple will not sell, assign, create or permit to exist any lien on or security interest in any Collateral to or in favor of anyone other than VCI, other than the sale of Inventory in the ordinary course of Big Apple's business. See **Exhibit 2** at ¶ 5.10.

19. To secure all of Big Apple's obligations to VCI under the Wholesale Loan Agreement and Capital Loan Agreement, Defendant, in addition to two other principals of Big Apple, each executed a Continuing Guaranty on October 29, 2008 ("Guaranty"). The Guaranty, by its terms, renders Defendant the primary guarantor under the Wholesale Loan Agreement and Capital Loan Agreement. A true and accurate copy of the Guaranty is attached hereto as **Exhibit 3**.

20. VCI has complied with all of its obligations under the Wholesale Loan Agreement and Capital Loan Agreement by advancing the monies described therein and providing wholesale floorplan financing to Big Apple through which Big Apple acquired, among other things, its entire vehicle inventory. Big Apple, however, defaulted under the terms of the Wholesale Loan Agreement by, among other things, selling more than 78 vehicles with a wholesale value of more than $1.2 million without making payment to VCI for the proceeds of the vehicle sales. This practice is commonly known in the automobile finance industry as selling out of trust ("SOT").

### B. VCI Learns of Big Apple's SOT

21. On or about March 3, 2011, VCI was notified by a mutual vendor, JM&A, that Big Apple was four (4) months past due on its account with JM&A.

22. On March 11, 2011, VCI sent an audit team to Big Apple, in an attempt to determine the status of Big Apple's automobile inventory, which constitutes collateral under Big Apple's Loan Agreement with VCI.

23. Upon arriving at Big Apple, VCI's audit team was turned away by Big Apple management and told to return any time during the week of March 13, 2011.

24. On March 15, 2011, VCI received information from reliable sources that Big Apple was conducting a secret liquidation of its inventory, in violation of the Loan Agreement.

25. On March 15, 2011, the VCI audit team returned to Big Apple and conducted an audit at the dealership.

26. As a result of the audit, and by March 16, 2011, VCI discovered that, in violation of the terms and conditions of the Wholesale Loan Agreement, Big Apple sold seventy eight (78) vehicles from its inventory, and failed and refused to remit payments to VCI, as required by the Loan Agreement, in the amount of $1,237,615.86.

27. Upon VCI's discovery of the SOT, Big Apple did provide VCI with documentation regarding the sale of some of the missing vehicles, but Big Apple prohibited VCI from examining the books and records and from performing a bank cut-off and other audit functions to determine the status of the proceeds of VCI's collateral, as allowed by the Loan Agreement.

28. Thereafter, VCI personnel were barred from Big Apple's premises.

29. As detailed below, VCI eventually learned that during the time of the above referenced audits of March 14, 2011 and March 15, 2011, Defendant transferred approximately $1.2 million from Big Apple's Wachovia Funding Account to family members, the amounts of which are very nearly equal the $1,237,615.86 SOT discovered by VCI on March 15, 2011.

### C.  VCI's District Court Action

30. On March 21, 2011, VCI initiated a suit against, in part, Defendant for Big Apple's breach of the Wholesale Loan Agreement, Capital Loan Agreement, Guaranty and further seeking replevin of its collateral in the United States District Court for the Southern District of New York (Index No. 11-cv-07950).

31. On March 22, 2011, VCI obtained an Order temporarily restraining and prohibiting Big Apple from conducting any business or paying its employees pending a hearing scheduled for April 1, 2011. This action was stayed after Big Apple filed for bankruptcy protection as detailed below.

32. On November 29, 2012, the District Court issued an Order directing the Clerk of Court to enter judgment in favor of VCI against, in part, Defendant, in the amount of $1,146,758.11. A true and accurate copy of the November 29, 2012 Order is attached hereto as **Exhibit 4**.

### D.  Relevant Big Apple Bankruptcy Proceeding and Factual Allegations Entitling VCI to Summary Judgment for a Non-Dischargeable Judgment Against Defendant

33. On March 30, 2011, Big Apple filed a voluntary bankruptcy petition under Chapter 11 of Title 11 of the Bankruptcy Code, Case. No. 11-11388 (JMP) ("Big Apple Petition").

34. Subsequent to the Big Apple Petition, on April 5, 2011, the United States Bankruptcy Court for the Southern District of New York, by Hon. James M. Peck, issued a Temporary Cash Collateral Order, the terms of which ordered Big Apple to make full and transparent disclosure to VCI of its financial affairs. Specifically, under the April 5, 2011 Order and Hon. James M. Peck's March 31, 2011 order from the bench, VCI was to receive information from Big Apple concerning its use of VCI's cash collateral, and VCI was permitted to review Big Apple's financial books and records.

35. Big Apple failed to meaningfully comply with the above referenced orders and had initially failed to turn over any meaningful documentation and denied or complicated VCI's access to the Big Apple dealership.

36. During this time period, Defendant was one of Big Apple's principals who received and participated in communications with VCI regarding the above referenced deficiencies, among others, however, Big Apple's principals advised VCI that it had "no more" documents to produce and that Big Apple planned to "sue" VCI.

37. In all, as of April 12, 2011, Big Apple had produced no documents from which VCI could trace the proceeds of its collateral that Big Apple has sold out of trust, or evaluate Big Apple's financial condition.

38. On April 20, 2011, for the first time, Big Apple provided to VCI the March, 2011 bank statement for the following: Wachovia Funding Account *********7695.

39. Big Apple did not produce documents showing the details of, payee/use of funds, and reasons for any withdrawals/transfers out of the account, including:

    3/14/2011: $718,000.00 counter-withdraw;

    3/15/2011: $504,271.14 – transfer to *********8157 (CCSC:C 85682).

40. VCI followed up with Big Apple's counsel on several occasions after the discovery of the above referenced withdrawal/transfer, but those efforts did not turn up documentation regarding the payee/use of funds.

41. The withdrawal and transfer amounts very nearly equal the $1,237,615.86 SOT discovered by VCI on March 15, 2011.

42. As a result, in part, of the withdrawal/transfer, on April 13, 2011 VCI filed a motion seeking to have a Chapter 11 Trustee ("Trustee") appointed for Big Apple pursuant to 11 U.S.C. § 1104(a) and Bankruptcy Rules 2007 and 9014. Over the objection of Big Apple, and after a hearing on May 3, 2011, the Court entered an Order directing the appointment of Trustee.

43. On May 2, 2011, Big Apple filed a Statement of Financial Affairs, in which it reported that in March, 2011, it had made the above referenced transfers/withdrawals in the amounts of $781,000.00 and $485,000.00 to Defendant's mother and others respectively. Defendant later clarified and corrected the Statement of Financial Affairs that the transfer/withdrawal to his mother actually amounted to $718,000.00, which comports with Big Apple's March, 2011 Wachovia Funding Account Bank Statement.

44. Upon information and belief, Defendant used SOT proceeds rightfully belonging to VCI to fund the withdrawal/transfer to his mother and brother-in-law.

45. At no time did VCI authorize the withdrawal/transfer of the amounts described above.

46. On March 15, 2011, the very next day after the $718,000.00 withdrawal described above, $504,271.14 was electronically transferred from Big Apple's Wachovia commercial checking account. Big Apple acknowledged that these funds were transferred by Defendant to his brother-in-law in Syria and described the transfer as "an investment."

47. Thus, within three weeks prior to the Big Apple Petition, Defendant transferred at least $1.2 million from Big Apple to members of his family.

48. Upon the Trustee taking over the operations of Big Apple, it was ultimately determined that the operations were not generating sufficient revenue to pay Big Apple's obligations, including debt service to VCI. On June 27, 2011 the Trustee made a motion for an order approving sale procedures and terms for Big Apple. The Court entered an Order approving the sale procedure and terms sought on July 13, 2011.

49. In compliance with the procedures and terms set forth in the sale order, the Trustee selected the highest or best offer of $930,000.00. The sale was ultimately approved by the Court on October 7, 2011 and closed on November 7, 2011.

50. On October 13, 2011, and in advance of the closing of the sale of Big Apple's assets, Trustee and VCI entered into a Stipulation deeming VCI's claims in the Big Apple Bankruptcy to be secured by valid and properly perfected first priority liens on all of [Big Apple's] assets, including the dealership assets and which also authorized Trustee to pay VCI the proceeds of the sale, net of closing adjustments and outstanding expenses. The Stipulation was "So Ordered" by the Court on December 20, 2011. A true and accurate copy of the December 20, 2011 Stipulation and Order is attached hereto as **Exhibit 5**.

51. VCI's first priority security interest is evidenced by a filed and amended, as necessary, UCC-1 Financing Statement. A true and correct copy of VCI's file-stamped, UCC-1 Financing Statement, as amended, perfecting VCI's security interest in the Collateral, is attached hereto as **Exhibit 6**.

52. The net proceeds of the sale were ultimately provided to VCI and credited to its secured claim, however, additional amounts remain due and owing.

53. As of November 27, 2012, the date VCI obtained judgment against Defendant, the amount due and owing to VCI totaled $1,146,758.11. See **Exhibit "4"**.

54. Defendant converted VCI's collateral, and the proceeds thereof, willfully and maliciously to his own benefit by transferring the SOT amounts to family members without VCI's knowledge or consent, and in knowing violation of the Wholesale Loan Agreement and Capital Loan Agreement between the parties.

55. I have been informed that Salim has asserted that these were legitimate business transactions, i.e., that part of the money was used to repay his mother for certain moneys purportedly loaned to him, and that the remainder was purportedly used to purchase used cars in Syria.

56. In light of these assertions by Defendant, and with the terms of the various agreements between the parties in mind, I state unequivocally that at no time did VCI authorize Big Apple or Salim to use VCI's cash collateral in this manner. At no time did VCI authorize Big Apple or Salim to use VCI's cash collateral to pay Salim's mother for any reason whatsoever. At no time did VCI authorize Big Apple or Salim to use VCI's cash collateral to buy used cars in Syria or anywhere else, or to enter into any business or investment transaction of any kind, in Syria or anywhere else.

**WHEREFORE,** VW Credit, Inc. respectfully requests the Court grant it summary judgment against Defendant, Julian Salim, pursuant to Fed. R. Bankr. P. 7056 determining that the entire judgment debt owed by Defendant to VW Credit, Inc. be non-dischargeable under 11 U.S.C. §§ 523(a)(4) and (6).

Date:   June 10, 2014

*Crystal Jeffrey Alexander*
Eastern Region Manager, Commercial Credit
VW Credit, Inc.

> Elisabeth Anne Hillman
> Notary Public, Commonwealth of Virginia
> My Commission Expires Oct. 31, 2018
> #7581678

*Elisabeth A. Hillman*  6/10/14