UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
In re:

JULIAN SALIM,                                          Chapter 7
                                                       Case No. 13-42974-ess
                                    Debtor.
------------------------------------------------------------------x

VW CREDIT, INC.,

                                    Plaintiff,

        -against-                                      Adv. Pro. No. 13-01442-ess

JULIAN SALIM,

                                    Defendant.
------------------------------------------------------------------x

**MEMORANDUM DECISION ON THE MOTION OF VW CREDIT, INC.
FOR SUMMARY JUDGMENT**

Appearances:

Jason A. Little, Esq.                         George Bassias, Esq.
Deily & Glastetter LLP                        21-83 Steinway
8 Thurlow Terrace                             Astoria, NY 11105
Albany, NY 12203

                                              Phillip Jaffe, Esq.
Jonathan R. Miller, Esq.                      370 East 76th Street
The Law Office of Jonathan R. Miller          Suite C-1002
1310 River Road                               New York, NY 10021
Titusville, NJ 08560

                                              *Attorneys for Julian Salim*

*Attorneys for VW Credit, Inc.*

HONORABLE ELIZABETH S. STONG
UNITED STATES BANKRUPTCY JUDGE

## Introduction

Before the Court is the motion of VW Credit, Inc. for summary judgment on its claims

that a debt owed to it by Julian Salim, the debtor in this Chapter 7 case, is nondischargeable

pursuant to Bankruptcy Code Sections 523(a)(4) and 523(a)(6) because the debt arises from

Salim's defalcation while acting as a fiduciary, from Salim's embezzlement, and from a willful

and malicious injury by Salim to VCI or its property.

The debt at issue (the "Judgment Debt"), in the amount of $1,146,758.11, arises out of

two agreements made between VW Credit, Inc. ("VCI") and Big Apple Volkswagen, LLC ("Big

Apple") with respect to VCI's financing of Big Apple's automotive sales.  The first is a

promissory note in the amount of $3,347,500, secured by Big Apple's inventory, among other

things (the "Wholesale Loan Agreement").  The second is a promissory note in the amount of

$250,000, also secured by Big Apple's inventory (the "Capital Loan Agreement, and together

with the Wholesale Loan Agreement, the "Loan Agreements").  Pursuant to the terms of the

Loan Agreements, a default by Big Apple on either agreement triggers a default on the other.

Salim, who initially held a 35 percent equity interest in Big Apple and later became the

company's majority owner, executed a personal guaranty of Big Apple's obligations under the

Loan Agreements (the "Salim Guaranty").

VCI brought an action against Big Apple, Salim, and others in the U.S. District Court for

the Southern District of New York (the "District Court Action"), alleging that Big Apple

breached the Loan Agreements by failing to remit payments to VCI for the automobiles that it

sold.  The District Court held that Salim and two other Big Apple members, John Koeppel and

Grzegorz Samborski, were personally liable for Big Apple's breach of the Loan Agreements.

The District Court entered judgment in favor of VCI and against Salim in the amount of $1,146,758.11, comprised of the value of the "sale out of trust" remaining after VCI's recovery from the liquidation of Big Apple's inventory, together with attorneys' fees and other expenses.

VCI seeks summary judgment on three claims pursuant to Federal Rule of Civil Procedure 56, made applicable in this adversary proceeding by Bankruptcy Rule 7056. First, VCI argues that the Judgment Debt should not be discharged pursuant to Bankruptcy Code Section 523(a)(4) because Salim's conduct giving rise to the debt constitutes a defalcation while acting in a fiduciary capacity. Second, VCI argues that the Judgment Debt should not be discharged pursuant to Section 523(a)(4) because Salim's actions giving rise to the debt amount to embezzlement. And third, VCI argues that the Judgment Debt should not be discharged pursuant to Bankruptcy Code Section 523(a)(6) because the debt arose from Salim's willful and malicious injury to VCI or its property. VCI also argues that as a threshold matter, collateral estoppel bars the relitigation of certain factual findings made in the District Court Action and relevant here.

In order to succeed on this motion, VCI must show that there is no genuine dispute as to a material fact as to each element of at least one of these claims. If so, VCI is entitled to judgment as a matter of law.

### Jurisdiction and Authority To Enter a Final Order

"Congress has divided bankruptcy proceedings into three categories: those that 'aris[e] under title 11'; those that 'aris[e] in' a Title 11 case; and those that are 'related to a case under title 11.'" *Stern v. Marshall*, 131 S. Ct. 2594, 2603 (2011) (citing 28 U.S.C. § 157(a)) (alterations in original).

The district courts have original, but not exclusive, jurisdiction in all cases "arising under" the Bankruptcy Code or "arising in or related to" cases under the Bankruptcy Code. 28 U.S.C. § 1334(b). "[A] proceeding is related to a case under the Bankruptcy Code 'if the outcome of the litigation might have any conceivable effect on the bankruptcy estate, or has any significant connection with the bankrupt estate.'" *Silverman v. A-Z Rx, LLC (In re Allou Distribs., Inc.)*, 2012 WL 6012149, at *6 (Bankr. E.D.N.Y. Dec. 3, 2012) (quoting *Lead I JV, LP v. North Fork Bank*, 401 B.R. 571, 581 (E.D.N.Y. 2009)).

This Court may hear each of VCI's claims as an "arising under" matter. VCI seeks a determination that the Judgment Debt is nondischargeable under the Bankruptcy Code. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). As such, this Court has jurisdiction to consider these claims under 28 U.S.C. § 1334(b) and the Standing Order of Reference dated August 28, 1986, as amended by Order dated December 5, 2012, of the U.S. District Court for the Eastern District of New York.

While it is clear that the bankruptcy court has jurisdiction over these claims, that is not the end of the inquiry. This Court is constrained by both statutory and constitutional limits to its authority to enter a final judgment. Judiciary Code Section 157 "permits a bankruptcy court to adjudicate a claim to final judgment in two circumstances – in core proceedings, see § 157(b), and in non-core proceedings 'with the consent of all the parties,' § 157(c)(2)." *Executive Benefits Ins. Agency v. Arkison*, 134 S. Ct. 2165, 2174 (2014). In addition, in order to enter a final judgment in a core proceeding, a bankruptcy court must have constitutional authority to do so pursuant to the Supreme Court's decisions in *Northern Pipeline Construction Co. v. Marathon Pipeline Co.*, 458 U.S. 50 (1982), *Stern*, and *Executive Benefits*. As the Supreme

3

Court observed, "Congress may not bypass Article III simply because a proceeding may have some bearing on a bankruptcy case; the question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Stern*, 131 S. Ct. at 2618. For non-core proceedings and for core proceedings for which the bankruptcy court does not have constitutional authority to enter a final judgment, the bankruptcy court may "'hear [the] proceeding,' and then 'submit proposed findings of fact and conclusions of law to the district court.'" *Executive Benefits*, 134 S. Ct. at 2172 (quoting 28 U.S.C. § 157(c)(1)) (alterations in original).

VCI's claims of nondischargeability arise under the Bankruptcy Code, and could not be asserted independent of Salim's bankruptcy case. These nondischargeability claims are core matters as to which this Court has constitutional authority to enter a final judgment, because they stem "from the bankruptcy itself." *Stern*, 131 S. Ct. at 2618. Accordingly, this Court may render a final decision and order adjudicating these claims. *See* 28 U.S.C. § 157(b)(2)(B).

## **Background**

### *The Debtor's Bankruptcy Case*

On May 15, 2013, Julian Salim filed a petition for relief under Chapter 7 of the Bankruptcy Code. Salim lists VCI on Schedule F of his Chapter 7 petition as a creditor holding an unsecured nonpriority claim in the amount of $1,146,758, and described the claim as "Personal Liability on debt to [Salim's] failed car dealership called Big Apple Volks[w]ag[e]n." Bankr. 13-42974, Dkt. 1, Pet. 17. In his Statement of Financial Affairs, Salim indicates that in the year preceding his bankruptcy filing, he was a defendant in an action captioned *VW Credit, Inc. v. Salim*, Case No. 11-1950, pending in the U.S. District Court for the Southern District of

4

New York.  On August 15, 2013, the Trustee in Salim's Chapter 7 case filed a Report of No

Distribution, and on October 28, 2014, Salim received a discharge.

*The District Court Action*

On March 22, 2011, VCI commenced the District Court Action against Big Apple, Salim,

and the two other Big Apple members, John Koeppel and Gzregorz Samborski, by filing a

complaint setting forth claims for breach of contract, breach of guaranties, and replevin of its

collateral.  *VW Credit, Inc. v. Big Apple Volkswagen, LLC,* 2012 WL 919386, at *2 (S.D.N.Y.

Mar. 15, 2012).  On July 11, 2011, Salim and Samborski filed an answer.  *Id.*

The record shows that Salim was a member, and eventually majority equity holder, of

Big Apple, an automobile dealership in the Bronx, New York.  As the District Court found, VCI

"loaned Big Apple money for its inventory of motor vehicles and provided a working capital line

of credit."  *VW Credit,* 2012 WL 919386, at *1.  Big Apple's indebtedness to VCI was

memorialized in a promissory note, dated June 12, 2006, in the amount of $3,347,500, and a

security agreement dated June 12, 2006.  *Id.*  In the Wholesale Loan Agreement, Big Apple

"agreed . . . to remit to VCI the portion of each vehicle sale or lease which represented the

monetary amount supplied by VCI to Big Apple under the loan," as well as to repay to VCI all

funds loaned, with specified interest.  *Id.*  About nine months later, on March 19, 2007, Big

Apple executed the agreements comprising the Capital Loan Agreement, an additional

promissory note for $250,000 and a related security agreement, under which Big Apple agreed to

repay VCI with interest on a specified timetable.  *Id.*  In the Wholesale Loan Agreement and

Capital Loan Agreement, Big Apple "granted to VCI a security interest in Big Apple's inventory

of vehicles, chattels, and proceeds."  *Id.*

As the District Court also found, Salim and the two other members of Big Apple each executed continuing personal guaranties of Big Apple's obligations to VCI under the Loan Agreements. *Id.* In particular, Salim executed the Salim Guaranty on October 29, 2008, under which he agreed personally to guarantee all of Big Apple's obligations to VCI. *Id.*

In the District Court Action, VCI claimed that Big Apple breached the Wholesale Loan Agreement by selling vehicles without remitting required payments to VCI, a practice sometimes described in the automobile finance industry as a "sale out of trust." VCI argued that this breach, in turn, triggered a breach of the Capital Loan Agreement. And VCI claimed that as a result of their guaranties, Salim, Koeppel, and Samborski were each jointly and severally liable for VCI's losses. *VW Credit,* 2012 WL 919386, at *4.

On March 30, 2011, Big Apple filed a petition for relief under Chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of New York. As a consequence, during the litigation of VCI's claims, the District Court Action was stayed as against Big Apple. *VW Credit,* 2012 WL 919386, at *2.

On August 2, 2011, VCI filed a motion in the District Court seeking summary judgment against Salim, Koeppel, and Samborski with respect to the liability portion of its breach of contract claim (the "Motion for Summary Judgment-Liability"). *Id.* On March 15, 2012, the District Court issued an Opinion and Order granting summary judgment in favor of VCI and against Salim, Koeppel, and Samborski on this claim. *VW Credit,* 2012 WL 919386, at *5. The District Court found Salim, Koeppel, and Samborski each jointly and severally liable in their individual capacities to VCI for Big Apple's contract breach, as a result of their personal guaranties. *VW Credit,* 2012 WL 919386, at *3, 4. Specifically, as the District Court explained,

6

"There is no room to construe the Guaranty Agreements as anything other than an absolute commitment by defendants Koeppel, Samborski, and Salim to be held jointly and severally liable for Big Apple's debts to VCI," including for the "full and prompt payment when due of all indebtedness." *VW Credit,* 2012 WL 919386, at *4.

In analyzing the question of liability under VCI's breach of contract claims, the District Court found that "Big Apple sold 78 vehicles from its inventory, but did not remit payment, as required under the Wholesale Loan Agreement, to VCI, in the amount of $1,237,615.86." *VW Credit,* 2012 WL 919386, at *1. The District Court also found that, on March 17, 2011, VCI reported by letter to Salim, Koeppel, and Samborski that it had "accelerated payment of all amounts due under the Wholesale Loan Agreement and the Capital Loan Agreement," as permitted by the Loan Agreements. *Id.* And the District Court found that Big Apple breached the Loan Agreements, the terms of which were "unambiguous on their face." *VW Credit,* 2012 WL 919386, at *3.

The District Court noted that Salim "did not oppose or otherwise respond" to VCI's Motion for Summary Judgment-Liability. *VW Credit,* 2012 WL 919386, at *2. The District Court directed Salim to "show good cause, in writing, for [his] failure to actively defend [the] litigation" within one week. *VW Credit,* 2012 WL 919386, at *6. Salim did not respond to the District Court's direction.

On May 16, 2012, VCI filed a Motion for Summary Judgment in the District Court with respect to the damages portion of its breach of contract claim, seeking $1,146,758.11 from Salim and his co-defendants (the "Motion for Summary Judgment-Damages"). *VW Credit, Inc. v. Big Apple Volkswagen, LLC,* 2012 WL 5964393, at *2 (S.D.N.Y. Mar. 15, 2012). On June 18, 2012,

7

Salim and Samborski submitted opposition to VCI's Motion for Summary Judgment-Damages, in the form of a counterstatement under Local Rule 56.1. VCI replied on June 25, 2012. *VW Credit*, 2012 WL 5964393, at *2.

On November 29, 2012, the District Court granted summary judgment in favor of VCI and against Salim, Koeppel, and Samborski as to damages, and awarded VCI the full amount that it sought, comprised of sums due under the Loan Agreements, interest, and "cost[s] of enforcing the terms . . . including reasonable attorneys' fees" and expenses associated with "protect[ing] [VCI's] collateral." *Id.* The District Court concluded that Salim, Koeppel, and Samborski were jointly and severally liable to VCI for $1,146,758.11. *VW Credit*, 2012 WL 5964393, at *6.

The District Court found that Salim's submission in opposition to the Motion for Summary Judgment-Damages was "inadequate" to raise a genuine dispute as to a material fact. *VW Credit*, 2012 WL 5964393, at *5. The District Court noted that Salim's counterstatement cited "two identical affidavits" by Salim and Samborski, and observed that those affidavits "contain[ed] nothing more than conclusory statements," including that the amounts spent to protect VCI's collateral and keep Big Apple open were "outrageous" and the attorneys' fees were "not reasonable or fair." *Id.*

In reaching its conclusions, the District Court relied upon records offered by VCI, documenting $514,835.20 in principal and $59,476.29 in interest due under the Wholesale Loan Agreement, and $54,166.98 in principal and $2,245.24 in interest due under the Capital Loan Agreement. *VW Credit*, 2012 WL 5964393, at *3. These amounts took into consideration "credits and cash collateral carve-outs paid to Big Apple's bankruptcy trustee" during Big

Apple's bankruptcy proceedings. *Id.* The District Court also "independently reviewed" documentation of $349,204.65 in VCI's attorneys' fees and expenses, as well as $166,820.75 in VCI's costs to protect the value of its collateral, including expenses related to hiring private security personnel, and held that these amounts could be recovered by VCI under the terms of the Loan Agreements. *VW Credit*, 2012 WL 5964393, at *4. Salim did not appeal from the District Court Judgment, and filed his Chapter 7 petition in this Court on May 15, 2013, some six months after the entry of judgment.

<u>This Adversary Proceeding and the Relief Sought</u>

On August 15, 2013, VCI commenced this adversary proceeding by filing a complaint seeking a determination that the Judgment Debt is nondischargeable pursuant to Bankruptcy Code Section 523(a)(4) on grounds that Salim's conduct constitutes defalcation while acting in a fiduciary capacity or, alternatively, embezzlement, and pursuant to Bankruptcy Code Section 523(a)(6) on grounds that Salim willfully and maliciously injured VCI or its property.

In the Complaint, VCI sets forth the history of the District Court Action and Big Apple's breach of the Wholesale Loan Agreement. In addition, VCI alleges that the Wholesale Loan Agreement "provides VCI a security agreement" and that Big Apple's Chapter 7 bankruptcy trustee "entered into a Stipulation deeming VCI's claims [against Big Apple] to be secured by valid and properly perfected first priority liens on all of [Big Apple's] assets." Adv. Pro. 13-01442, Dkt. 1, Compl. ¶¶ 10, 47. VCI also asserts that the Capital Loan Agreement "specifically acknowledges that none of the assets of Big Apple's business is, as of the date thereof, subject to any mortgage, pledge, lien, or encumbrance in favor of anyone other than VCI." Adv. Pro. 13-01442, Dkt. 33, Pl's Statement of Undisputed Facts ¶ 13.

9

VCI also describes certain events surrounding Big Apple's failure to remit payments to VCI. In particular, VCI alleges that, after learning of an unrelated default by Big Apple, VCI "sent an audit team to Big Apple" on March 11, 2011, "in an attempt to determine the status of Big Apple's automobile inventory." Compl. ¶ 19. VCI alleges that its audit team was "turned away by Big Apple management and told to return any time during the week of March 13, 2011," and that on March 15, 2011, the VCI audit team "returned to Big Apple and conducted an audit of the dealership." Compl. ¶¶ 20, 22. VCI alleges that this audit led it to discover the sale out of trust and breach of the Wholesale Loan Agreement. And VCI states that Big Apple did not provide it with full access to its books and records, as required by the Wholesale Loan Agreement, but rather, provided VCI with only limited access to selected documents and "barred" VCI from Big Apple's premises. Compl. ¶ 25. Salim denies these allegations and states in his Answer that "[VCI] was allowed to conduct a full audit." Adv. Pro. 13-01442, Dkt. 6, Def's Answer ¶ 3.

VCI alleges that Salim, acting through Big Apple, made certain unauthorized transfers of VCI's funds to his family members, specifically to his mother and brother-in-law. VCI also alleges that these transfers occurred at the same time that its audit team was seeking additional information about Big Apple's financial condition and inventory. Specifically, VCI asserts that the sales proceeds are its funds, rather than Big Apple's, and that Salim "used [sale out of trust] proceeds rightfully belonging to VCI to fund the withdrawal/transfer to his mother and brother-in-law." Compl. ¶ 41. VCI states that it did not authorize these transfers.

And VCI alleges, in substance, that Big Apple, and Salim as a member of Big Apple, did not comply with directives from the Southern District Bankruptcy Court to provide information

and documentation about these transfers in connection with Big Apple's Chapter 7 bankruptcy

case. VCI asserts that eventually, Big Apple filed a Statement of Financial Affairs "in which it

reported that in March, 2011, it had made . . . transfers/withdrawals in the amounts of $781,000

and $485,000 to [Salim's] mother and brother-in-law respectively," and that the first figure was

later corrected to $718,000. *Id.*

VCI asserts that Salim's actions, including participating in the sale out of trust, failing to

remit payments to VCI, and making unauthorized transfers of VCI's funds to his family

members, constitute "defalcation of [Big Apple's] fiduciary responsibility to VCI" because Big

Apple agreed, under the Wholesale Loan Agreement, to "hold in trust" the proceeds due to VCI.

Compl. ¶¶ 56, 57. VCI claims that Salim's fiduciary defalcation renders the Judgment Debt

nondischargeable under Bankruptcy Code Section 523(a)(4). For substantially the same reasons,

VCI also claims that the Judgment Debt is nondischargeable under Section 523(a)(4) because

Salim's actions constitute "embezzlement and/or larceny." Compl. ¶ 59.

VCI alleges that Salim "converted the funds from the sale of VCI's collateral, which

rightfully belong to VCI, with the willful and malicious intention of depriving VCI of the

proceeds of its collateral," and for these reasons too, VCI claims that the Judgment Debt is

nondischargeable under Bankruptcy Code Section 523(a)(6). Compl. ¶ 51.

On September 5, 2013, Salim responded to the Complaint by filing an answer. On

September 11, 2013, Salim filed an amended answer, setting forth five affirmative defenses and

a counterclaim. In his counterclaim, Salim alleges that VCI misrepresented the amount owed

and seeks "an accounting discovery of all amounts received" by VCI. Adv. Pro. 13-01442, Dkt.

7, Def's Amended Answer ¶ 16. He also asserts that VCI is "engaging in fraudulent collusion

with John Koeppel to deny" Salim his bankruptcy discharge, and seeks compensatory and punitive damages, as well as attorneys' fees and costs. Def's Amended Answer ¶ 17.

On October 2, 2013, VCI responded to Salim's counterclaim by filing a reply. VCI denies Salim's allegations, and asserts thirteen affirmative defenses to Salim's counterclaim, including, among others, failure to state a claim, failure to plead facts in support of various assertions, laches, and waiver. And VCI responds to Salim's claims as to the amount of the debt by arguing that the issue was "fully litigated" in the District Court Action, so that Salim's allegations are barred by collateral estoppel and res judicata.

On October 17, 2013, Salim filed a second amended answer, and dropped his counterclaim against VCI. Salim denies VCI's allegations, including its allegations as to the value of the sale out of trust, its allegations as to Big Apple's and Salim's hindering of VCI's efforts to investigate Big Apple's finances and sale out of trust, and its allegations as to Salim's transfers to his family members. Salim also asserts three affirmative defenses, including that VCI fails to state a claim upon which relief may be granted, that VCI "received all amounts owed by the trustee [for Big Apple] when the dealership was seized and sold," and that Salim's actions "individually and/or in a fiduciary capacity" were undertaken "in good faith and in the ordinary course of business." Adv. Pro. 13-01442, Dkt. 11, Def's Second Amended Answer ¶¶ 6, 8.

The parties have not submitted a joint statement of undisputed facts. On July 31, 2014, VCI filed a Statement of Undisputed Facts, under Local Rule 7056.1. Because Salim did not oppose VCI's Statement of Undisputed Facts, nor file his own Statement of Undisputed Facts, the facts in VCI's statement may be taken as undisputed. E.D.N.Y. LBR 7056.1. The Court's

findings of fact are based on the entire record, including VCI's Statement of Undisputed Facts, the extensive summary judgment record, this Court's docket, and, where appropriate, the District Court's decisions, and are construed in the light most favorable to Salim as the non-moving party.

*The Motion for Summary Judgment*

On June 11, 2014, VCI filed this motion for summary judgment seeking a determination that the Judgment Debt is nondischargeable under Bankruptcy Code Sections 523(a)(4) and 523(a)(6).  VCI argues that it is entitled to summary judgment because there is no genuine dispute as to a material fact that the Judgment Debt arose as a consequence of Salim's fiduciary defalcation, embezzlement, or willful and malicious injury to VCI.  VCI urges that the amounts awarded by the District Court for attorneys' fees and costs and for expenses to protect VCI's collateral are likewise nondischargeable, because the District Court awarded these amounts to VCI pursuant to the Loan Agreements.  VCI also argues that pursuant to the doctrine of collateral estoppel the District Court's factual findings as set forth in its decisions on the Motion for Summary Judgment-Liability and the Motion for Summary Judgment-Damages, including its findings with respect to the sale out of trust by Big Apple, the breaches of the Loan Agreements by Big Apple, the existence and validity of the Salim Guaranty, and the amount of the Judgment Debt, are binding on Salim and may not be relitigated here.

As to its Section 523(a)(4) claims, VCI argues that it is entitled to summary judgment that the Judgment Debt is nondischargeable on grounds, among others, that it arose from conduct by Salim, including participation in the sale out of trust, that constitutes a defalcation by a fiduciary and embezzlement.  As to its fiduciary defalcation claim, VCI argues, in substance, that

13

the contract language "hold in trust" is sufficient to establish both an express trust and a fiduciary obligation, and that Salim recklessly disregarded that obligation. Adv. Pro. 13-01442, Dkt. 25, Pl's Mot. Summ. J. Mem. of Law 11 ("VCI Mem."). As to its embezzlement claim, VCI argues, in substance, that the proceeds of the sale out of trust were its funds and that when Salim made transfers to his relatives, he was not only transferring VCI's cash collateral but also embezzling VCI's property.

As to its Section 523(a)(6) claim, VCI argues that it is entitled to summary judgment that the Judgment Debt is nondischargeable on grounds that it arose from Salim's willful and malicious injury to VCI or its property. VCI argues that collateral estoppel prevents Salim from relitigating the District Court's findings, including those with respect to the sale out of trust. And VCI argues that it is undisputed that VCI did not grant Salim permission to transfer funds to his family members. While VCI acknowledges that Salim asserts that he acted in good faith and within the ordinary course of business in making those transfers, VCI urges that Salim's conduct is sufficient to demonstrate the requisite "willful and malicious injury" to VCI or its property to render the Judgment Debt nondischargeable under Section 523(a)(6), because Salim's conduct was deliberate and unjustified in light of the plain terms of the Loan Agreements. VCI also argues that Salim's awareness of his obligation to remit payment to VCI and decision to disregard that duty and instead transfer the funds to his family members establishes that he acted with malice towards VCI's interests.

On July 31, 2014, Salim filed a Memorandum of Law and Affidavit in Opposition to VCI's Motion. Salim argues, among other things, that the "material issue before the Court" is his intent. Adv. Pro. 13-01442, Dkt. 32, Def's Opp'n Mem. of Law 5 ("Salim Mem."). He

states that "[e]very action [he] took was with the valid authority [he] had as an employee and officer of Big Apple and in good faith and the ordinary course of business" and that, in the absence of proof of his fraudulent intent, the Judgment Debt should be discharged.  Adv. Pro. 13-01442, Dkt. 31, Def's Opp'n ¶ 15.  Salim also argues that the transfers he made were valid and for legitimate business purposes, to his mother to repay a loan that she made to Big Apple to launch the dealership, and to his brother-in-law in connection with a business venture to purchase used vehicles in Syria.  In addition, Salim argues that VCI has already recovered the amounts due to it from the sale out of trust "when it seized my dealership and accounts."  Def's Opp'n ¶ 14.  Salim states that he was "not able to defend [the District Court Action and other lawsuits] because I lost my dealership and had no job and money to pay the lawyers."  Def's Opp'n ¶ 9.

Salim also argues that VCI's nondischargeability claims should be barred by res judicata and claim preclusion because in the District Court Action, VCI brought solely breach of contract claims, not claims of fiduciary breach, fraud, conversion, or other malicious conduct.  He argues that the District Court did not "conclude that [his] actions were willful or malicious" or "indicate[] fraud on [his] part," and as such, VCI should be barred by res judicata and claim preclusion from bringing claims grounded on such assertions here.  Salim Mem. 10, 11.  Salim asks the Court to dismiss VCI's claims and enter summary judgment in his favor.

On August 18, 2014, VCI filed a reply memorandum in further support of its Motion. VCI argues that Salim's arguments as to his intent in directing Big Apple to transfer funds to his family members are "conclusory and self-serving justifications" and insufficient to create a genuine dispute as to a material fact.  Adv. Pro. 13-01442, Dkt. 36, Pl's Reply Mem. 3.  VCI also

argues that Salim has either conceded or not disputed many key material facts, including the facts surrounding the transfers of funds to his family members and his actions in a fiduciary capacity. And VCI argues that it should not be barred by res judicata and claim preclusion from contesting the dischargeability of the Judgment Debt because it could not have raised the question of dischargeability in the District Court Action.

On August 19, 2014 and September 23, 2014, the Court held hearings and heard argument on VCI's Motion for Summary Judgment, at which the parties, by counsel, appeared and were heard.

## Discussion

### *The Summary Judgment Standard*

Federal Rule of Civil Procedure 56, made applicable to this Adversary Proceeding by Bankruptcy Rule 7056, provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party has the burden of demonstrating the absence of a genuine dispute as to any material fact, and all of the inferences to be drawn from the underlying facts must be viewed by the court in the light most favorable to the party opposing the motion. *See Anderson*, 477 U.S. at 249, 255; *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003). As the Second Circuit has explained, "all ambiguities must be resolved and all inferences drawn in favor of the

party against whom summary judgment is sought." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994). Accordingly, the moving party must first demonstrate that there is no genuine dispute as to a material fact as to each element of its claim. If it does not, then summary judgment will be denied. *See Smith v. Goord*, 2008 WL 902184, at *4 (N.D.N.Y. Mar. 31, 2008) (citing *Anderson*, 477 U.S. at 250 n.4), *aff'd*, 375 F. App'x 73 (2d Cir. 2010).

If the moving party meets this initial burden, "the burden then shifts to the nonmoving party to come forward with evidence sufficient to create a genuine dispute as to a material fact for trial." *Silverman v. United Talmudical Academy Torah Vyirah, Inc. (In re Allou Distribs., Inc.)*, 446 B.R. 32, 49 (Bankr. E.D.N.Y. 2011). That is, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine'" dispute as to a material fact for trial and summary judgment is appropriate. *Matsushita*, 475 U.S. at 587 (citation omitted). *See McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (citing *Matsushita*, 475 U.S. at 587).

Statements in the pleadings alone are not sufficient to meet this burden. *UTA*, 446 B.R. at 49. Rather, "[e]stablishing such facts requires going beyond the allegations of the pleadings, as the moment has arrived 'to put up or shut up.'" *In re Eugenia VI Venture Holdings, Ltd. Litig.*, 649 F. Supp. 2d 105, 117 (S.D.N.Y. 2008) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000)), *aff'd*, 370 F. App'x 197 (2d Cir. 2010), *cert. denied*, 540 U.S. 811 (2003). "Unsupported allegations in the pleadings thus cannot create a material issue of fact."

17

*Id.*

Claims that sound in fraud raise additional considerations. "While the issue of fraudulent intent ordinarily cannot be resolved on summary judgment, it is also well-recognized that the summary judgment rule would be rendered sterile if the mere incantation of intent would operate as a talisman to defeat an otherwise valid motion." *UTA*, 446 B.R. at 50 (citations and internal quotation marks omitted). *See Dister v. Cont'l Grp.*, 859 F.2d 1108, 1114 (2d Cir. 1988) (noting that when intent is at issue, "summary judgment should be used sparingly").

And finally, the denial of summary judgment in the face of a genuine dispute as to a material fact does not amount to the court's endorsement of the defendant's position. *UTA*, 446 B.R. at 50 (citing *Huff v. UARCO, Inc.*, 122 F.3d 374, 385-86 (7th Cir. 1997)). Rather, denial of summary judgment means only that the case should be heard by the trier of fact, and cannot be resolved as a matter of law.

*Res Judicata and Claim Preclusion*

Res judicata and claim preclusion bar the "relitigation . . . of claims that were, or could have been, brought in an earlier litigation between the same parties or their privies." *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 919 (2d Cir. 2010). In other words, res judicata, "or claim preclusion, provides that a 'final judgment on the merits of an action precludes the parties . . . from relitigating issues that were or could have been raised in that action.'" *Maharaj v. Bankamerica Corp.*, 128 F.3d 94, 97 (2d Cir. 1997) (quoting *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981)).

At the same time, a creditor is not barred by these doctrines from contesting the dischargeability of a debt arising from a judgment rendered by another court. Nor is a creditor

prevented from raising an issue or presenting evidence in the bankruptcy court that is relevant to

the nondischargeability action, but that was not relevant to the prior claim or action.  As the

Supreme Court has observed, where a creditor was "attempting to meet . . . the new defense of

bankruptcy which [the debtor] has interposed between [the creditor] and the sum determined to

be due him . . . it would hardly promote confidence in judgments to prevent [the creditor] from

meeting [the debtor's] new initiative."  *Brown v. Felsen*, 442 U.S. 127, 133-34 (1979).

As one court in this Circuit has noted in this context, in pursuing a dischargeability

action, the creditor did "not seek to assert any new claims."  *Giaimo v. Detrano (In re Detrano)*,

266 B.R. 282, 289 (E.D.N.Y. 2001), *aff'd and remanded*, 326 F.3d 319 (2d Cir. 2003).  Rather,

"[t]he only issue before the bankruptcy court [was] whether or not [the debtor] can avoid paying

the amount."  *Id.*  As another court found:

> [I]t was not necessary that the plaintiff plead fraud, defalcation, larceny or
> embezzlement in its state court complaint.  Any determination by the state court
> of fraud or other improper actions on the part of the debtor may be adopted by
> this court, but ultimately it is the bankruptcy court's exclusive jurisdiction to
> determine the elements required for the finding of nondischargeability.

*Stone v. Stone (In re Stone)*, 90 B.R. 71, 75 (Bankr. S.D.N.Y. 1988), *aff'd*, 94 B.R. 298

(S.D.N.Y. 1988), *aff'd*, 880 F.2d 1318 (2d Cir. 1989).

### *Whether VCI's Claims Are Barred by Res Judicata and Claim Preclusion Because They Were Not Raised in the District Court Action*

As a threshold matter, Salim argues that VCI's claims are barred by res judicata and

claim preclusion because VCI asserted only breach of contract claims in the District Court

Action, and did not assert claims of fiduciary breach, fraud, conversion, or other malicious

conduct.  For these reasons, Salim urges, the final judgment rendered by the District Court now

bars VCI from raising these issues here, because they could have been addressed in that action.

VCI responds that the "issue of the nondischargeability of [Salim's] obligations to VCI had not yet ripened" at the time of the District Court Action, as Salim had not yet filed for bankruptcy protection and the parties were not before a bankruptcy court.

Here, the creditor is not required to anticipate that a defendant in a breach of contract action may someday become a debtor in a bankruptcy case. That is, VCI is not precluded from litigating here matters that were not necessary to its claims against Salim in another forum. The question before this Court is not the validity of the Judgment Debt, but whether it should be subject to Salim's bankruptcy discharge. And the question of dischargeability is the province of the bankruptcy court. As a consequence, VCI's claims are not barred by the doctrines of res judicata and claim preclusion.

### Collateral Estoppel and Issue Preclusion

Collateral estoppel and issue preclusion prevent "parties or their privies from relitigating in a subsequent action an issue of fact or law that was fully and fairly litigated in a prior proceeding." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 288 (2d Cir. 2002). A "judgment in the prior suit precludes relitigation of issues actually litigated and necessary to the outcome of the first action." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 n.5 (1979) (citations omitted). In other words, "'when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.'" *Rahman v. Park (In re Park)*, 2011 WL 1344495, at *4 (Bankr. E.D.N.Y. Apr. 8, 2011) (quoting *Leather v. Ten Eyck*, 180 F.3d 420, 424 (2d Cir. 1999)). As the Restatement (Second) of Judgments states:

> When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the

20

> determination is conclusive in a subsequent action between the parties, whether
> on the same or a different claim.

Restatement (Second) of Judgments § 27 (1982).

As the Supreme Court has confirmed, "collateral estoppel principles do indeed apply in discharge exception proceedings pursuant to § 523(a)." *Grogan v. Garner*, 498 U.S. 279, 284 n.11 (1991). *See Indo-Med Commodities, Inc. v. Wisell (In re Wisell)*, 494 B.R. 23, 34 (Bankr. E.D.N.Y. 2011) (explaining that "[i]n establishing a cause of action under Section 523(a), a creditor may invoke the principles of collateral estoppel, or issue preclusion").

And as the Second Circuit has similarly stated, "[b]ankruptcy proceedings may not be used to relitigate issues already resolved in a court of competent jurisdiction." *Kelleran v. Andrijevic*, 825 F.2d 692, 695 (2d Cir. 1987), *cert. denied*, 484 U.S. 1007 (1988). This rule promotes judicial economy and reduces the burdens of litigation on parties. It is also consistent with the notion that claims arising as a consequence of the bankruptcy case should be decided by the bankruptcy court. "While this Court is prevented from looking behind the findings of fact and conclusions of law . . . the bankruptcy court is the sole authority to determine whether the Plaintiff's claim against the Debtor is non-dischargeable under Section 523(a)(2), (4) or (6)." *Wisell*, 494 B.R. at 34.

Courts recognize that the application of the collateral estoppel doctrine differs based on the forum in which first judgment was entered. As several courts have found, "[when] the issues sought to be precluded were decided by a *federal* court, as in the case at bar, the Bankruptcy Court must apply the theoretically uniform federal common law of collateral estoppel." *FTC v. Wright (In re Wright),* 187 B.R. 826, 832 (Bankr. D. Conn. 1995). *See, e.g., Smith v. Entrepreneur Media, Inc. (In re Smith)*, 2009 WL 7809005, at *8 (B.A.P. 9th Cir. Dec. 17,

2009), *aff'd*, 465 F. App'x 707 (9th Cir. 2012) (stating that "[t]he application of issue preclusion

to a prior federal judgment is determined by federal law").

    Several requirements must be met in order for a prior federal judgment to have preclusive

effect.  As the Second Circuit has observed, federal collateral estoppel bars relitigation of an

issue when:

> (1) [T]he identical issue was raised in a previous proceeding; (2) the issue was
> actually litigated and decided in the previous proceeding; (3) the party had a full
> and fair opportunity to litigate the issue; and (4) the resolution of the issue was
> necessary to support a valid and final judgment on the merits.

*Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006) (internal quotation marks omitted).

    When collateral estoppel is invoked by a plaintiff in the context of a summary judgment

motion, the plaintiff bears the burden on each of the requirements, except that the party opposing

the application of collateral estoppel bears the burden of "showing that the prior action did not

afford a full and fair opportunity to litigate."  *Kulak v. City of New York*, 88 F.3d 63, 72 (2d Cir.

1996).

    <u>Substantial Identity of Issues</u>

    The first requirement, that the issues are substantially identical in the pending and prior

proceedings, calls for the court to ascertain:

> whether the issues presented by this litigation are in substance the same as those
> resolved [in the prior litigation]; whether controlling facts or legal principals have
> [not] changed significantly since the [prior litigation]; and finally, whether special
> circumstances warrant exception to the normal rules of preclusion.

*Montana v. U.S.*, 440 U.S. 147, 155 (1979).

    "Direct identity of issue" is not required for collateral estoppel to apply.  *Yash Raj Films*

*(USA) v. Ahmed (In re Ahmed)*, 359 B.R. 34, 40 (Bankr. E.D.N.Y. 2005) (citing *Montana,* 440

U.S. at 155).  Courts in this Circuit have found that the issues presented in the two actions need not be absolutely identical, although "the legal standards governing their resolution [must not be] significantly different."  *Cerny v. Rayburn*, 972 F.Supp. 2d 308, 316 (E.D.N.Y. 2013).  Rather, "it is sufficient that the issues presented in [the earlier litigation] are *substantially the same* as those presented by [the later] action."  *Cerny*, 972 F.Supp. 2d at 316-17 (emphasis added, citations omitted).

> ### Actual Litigation and Determination of the Issue

The second requirement, that the issue was actually litigated and decided in the prior proceeding, is satisfied where the issue was "raised by the pleadings or otherwise placed in issue."  *Evans v. Ottimo*, 469 F.3d 278, 282 (2d Cir. 2006) (internal citations omitted).  Courts recognize that where the defendant does not appear or participate in the proceedings in any way, and a default judgment is entered, that judgment may not merit preclusive effect.  *See, e.g.*, *Ahmed*, 359 B.R. at 44.  At the same time, a full trial on the merits is not a prerequisite for collateral estoppel to apply.  Rather, preclusion is appropriate where "[t]he issue [was] raised by the pleadings or otherwise placed in issue and actually determined in the prior proceeding." *Dolan v. Roth*, 325 F. Supp. 2d 122, 133 (N.D.N.Y. 2004), *rev'd in part on other grounds*, 170 F. App'x 743 (2d Cir. 2006).

> ### Absence of a Full and Fair Opportunity To Litigate the Issue

The third requirement, that the party against whom collateral estoppel is invoked had a full and fair opportunity to litigate the issue, calls for the court to determine whether that party "was fully able to raise the same factual or legal issues" in the prior litigation.  *LaFleur v. Whitman*, 300 F.3d 256, 274 (2d Cir. 2002).

As distinct from the "actually litigated" element, the requirement that the party opposing collateral estoppel had a full and fair opportunity to litigate the issue requires the court to examine whether the party "was fully able to raise the same factual or legal issues . . . assert[ed in the prior proceeding]." *Id.* For example, the Second Circuit declined to apply collateral estoppel where the defendant did not have a fair opportunity to litigate based on, among other considerations, the trial judge's statements that "clearly abrogated his responsibility to function as a neutral, impartial arbiter" and demonstrated a "fundamental misunderstanding of the basis" of the defendant's claim. *Ali v. Mukasey*, 529 F.3d 478, 491 (2d Cir. 2008) (internal citation omitted). Similarly, the Seventh Circuit declined to apply collateral estoppel where an immigration judge used language of religious intolerance, stating that it "taints the proceedings, erodes the appearance of fairness and creates substantial uncertainty as to whether the record below was fairly and reliably developed." *Floroiu v. Gonzales*, 481 F.3d 970, 974 (7th Cir. 2007).

<u>Necessity of the Issue To Support the Final Judgment</u>

The fourth and final requirement for collateral estoppel to apply, that the issue previously determined was necessary to support the final judgment, requires the court to consider the elements of the prior claim and whether a final judgment was entered. This assures that an issue that was ancillary to the first determination, or an issue that was not finally determined, will not be invoked to bar the consideration of a disputed issue by the second court. As one Court of Appeals noted, "for purposes of issue preclusion . . . 'final judgment' includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect." *Wolstein v. Docteroff (In re Docteroff)*, 133 F.3d 210, 216 (3d Cir. 1997)

(quoting Restatement (Second) of Judgments § 13 (1982)).

*Whether Collateral Estoppel Precludes the Relitigation of Factual Findings by the District Court*

  VCI argues that the principle of collateral estoppel prevents the parties from relitigating factual findings necessary to the District Court Judgment that are also relevant to VCI's claims against Salim before this Court.

  VCI's reliance on the District Court's factual findings calls on this Court to examine the requirements of collateral estoppel in the context of VCI's claims and the District Court Judgment.  That is, this Court must determine whether the factual issues are substantially identical to issues determined by the District Court, whether the factual issues were actually litigated in that forum, whether Salim had a full and fair opportunity to litigate the issues there, and whether the issues were necessary to the District Court's final determination that resulted in the Judgment Debt.  If these criteria are met, then Salim may be precluded from relitigating the issues here.

  The District Court found that on October 29, 2008, several years before the sale out of trust, Salim executed a continuing guaranty of Big Apple's obligations to VCI under the Loan Agreements.  *VW Credit,* 2012 WL 919386, at *1.  The District Court also held that Big Apple "sold 78 vehicles from its inventory, but did not remit payment, as required under the Wholesale Loan Agreement, to VCI."  *Id.*  And the District Court also found that on March 17, 2011, VCI reported by letter to Salim and his partners that it had "accelerated payment of all amounts due under the Wholesale Loan Agreement and the Capital Loan Agreement," as permitted by the Loan Agreements.  *Id.*  In addition, in granting summary judgment to VCI and against Salim, Koeppel, and Samborski as to damages, the District Court awarded VCI the full amount that it

25

sought, comprised of sums due under the Wholesale Loan Agreement, interest, and "cost[s] of enforcing the terms . . . including reasonable attorneys' fees" and expenses associated with "protect[ing] [VCI's] collateral." *VW Credit*, 2012 WL 5964393, at \*2.  The District Court concluded that Salim, Koeppel, and Samborski were jointly and severally liable to VCI in the amount of $1,146,758.11.  *VW Credit*, 2012 WL 5964393, at \*6.

As to the first requirement of collateral estoppel, whether the issues are substantially identical in this action and the prior proceeding, the record shows that certain factual issues before this Court were also before the District Court, including that Big Apple sold vehicles without remitting payment to VCI, that VCI accelerated payments due under the Loan Agreements after discovering Big Apple's breach, and that Salim personally guaranteed those agreements.  The District Court also determined VCI's damages from the sale out of trust, and found that VCI's damages included consequential damages such as VCI's expenses to protect its collateral, as well as its attorneys' fees and costs.  These factual issues are substantially identical in this case and in the District Court Action.  As a consequence, this requirement is met.

As to the second requirement of collateral estoppel, whether the issue was actually litigated and determined in the prior proceeding, Salim argues that VCI's allegations of fraud were not before the District Court.  It is true that the breach of contract claims before the District Court did not require consideration of Salim's intent.  But the record shows that the sale out of trust, VCI's acceleration of the Loan Agreements, the existence of the Salim Guaranty, and the extent of VCI's damages from the sale out of trust were all "raised by the pleadings or otherwise placed in issue" in the District Court Action.  *Dolan*, 325 F. Supp. 2d at 133.  The record also shows that the District Court's findings were the result of extensive litigation, including Salim's

Answer to VCI's Complaint and his counterstatement in response to the Motion for Summary Judgment-Damages.  For these reasons, the findings of the District Court as to the sale out of trust, VCI's acceleration of the Loan Agreements, the existence of the Salim Guaranty, and the amount of VCI's damages from the sale out of trust were each actually litigated and determined in the District Court Action, and this requirement is met.

As to the third requirement of collateral estoppel, whether there was a full and fair opportunity to litigate the issues, the record shows that, as described above, the District Court's findings as to the sale out of trust, VCI's acceleration of the Loan Agreements, the existence of the Salim Guaranty, and the amount of the damages to VCI from the sale out of trust were the result of extensive litigation, and that Salim had the opportunity to participate in the extensive proceedings before the District Court.  Salim argues that he did not have the funds to defend that litigation.  But the record shows that he was represented by counsel and was a party to the District Court Action, and his personal liability was directly at issue.  Moreover, while he did not respond to the Motion for Summary Judgment-Liability, Salim did respond to VCI's Complaint and to the Motion for Summary Judgment-Damages.  For these reasons, Salim had a full and fair opportunity to litigate these issues, and this requirement is met.

As to the fourth requirement of collateral estoppel, whether determination of the issue was necessary to the final judgment, the record shows that the District Court's determinations as to the sale out of trust, VCI's acceleration of the Loan Agreements, and the existence of the Salim Guaranty formed the basis for the District Court's assessment of VCI's breach of contract claim and its conclusion that Salim is personally liable for the Judgment Debt.  In addition, the District Court's assessment of the amount of the damage to VCI was central to its decision

27

regarding the Motion for Summary Judgment-Damages.  For these reasons, these findings were necessary to support a final and valid judgment on the merits, and this requirement is met.

For these reasons, and based on the entire record, this Court is bound to accept the District Court's findings as to the sale out of trust, VCI's acceleration of the Loan Agreements, the existence of Salim's personal guaranty, and the amount of the damages to VCI from the sale out of trust, and the parties are precluded from relitigating these issues here.

### The Elements of a Section 523(a)(4) Claim for Defalcation by a Fiduciary

Bankruptcy Code Section 523(a)(4) excludes from discharge debts that are a result of "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  11 U.S.C. § 523(a)(4).  This "'dischargeability provision has for more than a century been construed narrowly and strictly by the Supreme Court.'"  *Owens v. Owens (In re Owens)*, 2005 WL 387258, at *4 (S.D.N.Y. Feb. 17, 2005) (quoting *In re Gans*, 75 B.R. 474, 488 (Bankr. S.D.N.Y. 1987)).  As this Court has noted, "[t]his penalty is not lightly to be invoked, as it is widely recognized that exceptions to discharge are narrowly construed."  *Chao v. Duncan (In re Duncan)*, 331 B.R. 70, 87 (Bankr. E.D.N.Y. 2005).  The Supreme Court has determined that "the ordinary preponderance standard . . . govern[s] the applicability of all the discharge exceptions."  *Grogan*, 498 U.S. at 288.

A creditor seeking to establish that a debt should be excepted from discharge under Section 523(a)(4) for defalcation while acting in a fiduciary capacity must demonstrate three elements.  These elements are, first, that the debt was incurred in connection with an express or technical trust, second, that the debtor acted in a fiduciary capacity with respect to that trust, and third, that the debtor engaged in fraud or a defalcation within the meaning of bankruptcy law.

*Chao*, 331 B.R. at 77.  *See Bullock v. BankChampaign, N.A.,* 133 S. Ct. 1754, 1760 (2013) (finding that defalcation "as commonly used . . . can encompass a breach of fiduciary obligation that involves neither conversion, nor taking and carrying away another's property, nor falsity").

As to the first element of a Section 523(a)(4) fiduciary defalcation claim, whether there is an express or technical trust, such a trust may be created by a formal trust agreement or by statute.  *Hutton v. Schulman (In re Schulman)*, 196 B.R. 688, 697 (Bankr. S.D.N.Y. 1996).  But the use of the term "trust," without more, may not be enough.  As one court has explained, "courts are careful to distinguish between a debtor-creditor relationship with trust provisions imposed by the creditor to enhance collection of the debt, and a true fiduciary or trust relationship."  *In re Bowles*, 318 B.R. 129, 142-43 (Bankr. E.D. Wis. 2004) (explaining that only "a debtor-creditor relationship existed" where trust terminology was used, "similar to that of a retailer who agrees to hold the collateral proceeds of his floor plan lender in trust").

In addressing whether an express trust and a fiduciary relationship were present, one court noted:

> [T]he use of trust language in a contract may not be sufficient . . . .  [I]t has been held that the insertion in a commercial contract of the words, "holds in trust," or similar ones, may not establish the existence of a trust that gives rise to a fiduciary relationship.

*In re Paulino*, 2014 WL 5358409, at *6 (Bankr. S.D.N.Y. Oct. 20, 2014).  There, the court found that the record did not indicate that the debtor committed a fiduciary defalcation, despite the use of the language of "hold in trust" in the parties' contract and a signature line that required the debtor to sign as "trustee."  *Paulino*, 2014 WL 5358409, at *6-7.  And as the court in *Paulino* noted, other courts have similarly "distinguish[ed] between a trustee-beneficiary relationship, in which the trustee is the equitable owner, and a debtor-creditor relationship, in which a creditor

29

has merely a claim against the debtor." *Paulino*, 2014 WL 5358409, at *6 (citing *Auto-Owners Ins. Co. v. Lipke (In re Lipke),* 54 B.R. 704, 705 (Bankr. W.D. Wis. 1985); *In re Schultz,* 46 B.R. 880, 885 (Bankr. D. Nev. 1985); *Borg-Warner Acceptance Corp. v. Miles (In re Miles),* 5 B.R. 458 (Bankr. E.D. Va. 1980)). As another court observed, "[a] trust clause inserted into a document which sets up a debtor-creditor relationship in an effort to assure the debtor's performance of its obligation does not create a trust." *Matter of Graham*, 7 B.R. 5, 6 (Bankr. D. Nev. 1980).

Several factors in addition to the use of trust terminology may indicate the presence of an express trust. The most significant of these requirements is that the debtor segregate expressly identified trust proceeds, and hold those proceeds in a separate account maintained for this purpose. This requirement is consistent with the special nature and obligations of a trust relationship. *See Matter of Graham*, 7 B.R. at 6 (stating that "[a] fiduciary relationship requires a separate account"); *Morse v. Rice (In re Morse)*, 504 B.R. 462, 472 (Bankr. E.D. Tenn. 2014) (finding that there was no trust present where the final contractual language described an obligation to "hold in trust" funds, but omitted an earlier term to maintain an escrow account); *Penix v. Parra (In re Parra)*, 483 B.R. 752, 768 (Bankr. D.N.M. 2012) (holding that there was no trust present between a consignor and a used car dealership where "there was no written trust document that named a trustee with particularized trust duties and identified specific property that the trustee was required to hold in trust for the benefit of another").

In the context of the automobile financing industry, courts have found that the use of the terms "trust" or "sale out of trust" in connection with the extension of "floorplan credit" to finance vehicle sales is not enough to establish a trust and a fiduciary relationship. As one court

observed, "[t]he fact that a commercial agreement contains the word 'trust' does not make the agreement a trust agreement nor does it create a fiduciary relationship." *Ford Motor Credit Co. (In re Gallaudet),* 46 B.R. 918, 925 (Bankr. D. Vt. 1985).  There, the court found that a floorplan credit agreement with an automobile dealership did not create an express trust for purposes of Section 523(a)(4).  As the *Gallaudet* court explained, "It is the character of the debt relationship and not its form that determines whether a fiduciary 'trust' relationship exists." *Gallaudet*, 46 B.R. at 925.

Courts have likewise found that an express trust and the associated fiduciary relationship may be present in the context of a floorplan credit agreement where the contract includes not only the use of trust nomenclature but also terms as to the trust funds, including terms providing for the segregation of the trust proceeds from the debtor's own funds.  For example, in *Kubota Tractor Corp. v. Strack (In re Strack)*, 524 F.3d 493 (4th Cir. 2008), the court held that an express trust was present pursuant to Section 523(a)(4), where the contract required the debtor to segregate and "hold in trust" the proceeds.  And in *Chrysler Credit Corp. v. Perry Chrysler Plymouth,* 783 F.2d 480 (5th Cir. 1986), the court determined that a trust was present where a floorplan agreement "provided categorically that any proceeds from the sale of the vehicles . . . must be kept separate from [the corporate] funds, held in trust for [the creditor], and transferred immediately to it." *Chrysler Credit,* 783 F.2d at 484.

By contrast, courts have concluded that where the floorplan credit agreement does not provide for the segregation of funds or otherwise provide for the substance of a trust, not just a trust label, the requirements of a express or technical trust are not met.  As the court in *Gallaudet* concluded, where a floorplan credit agreement included neither segregation of proceeds nor

31

maintenance of a separate account, there was neither an express or technical trust nor a fiduciary

relationship. *Gallaudet*, 46 B.R. at 925.  And similarly, another court found that despite the use

of the phrase "hold in trust" in a floorplan agreement and an obligation that the debtor pay the

sale proceeds to the creditor within 48 hours of a sale, an express trust was not created because

"the agreement did not require the Debtor to turn over the actual proceeds obtained . . . [n]or did

the agreement expressly require him to hold cash proceeds in a separate account or otherwise

segregate the funds." *Dealer Servs. Corp. v. Goldstein (In re Goldstein)*, 2011 WL 5240335, at

*1 (Bankr. N.D. Ill. Oct. 31, 2011).

As to the second element of a Section 523(a)(4) fiduciary defalcation claim, whether the

debtor acted in a fiduciary capacity with respect to the trust, courts look to federal common law

to determine the meaning of "fiduciary capacity." *Zohlman v. Zoldan (In re Zoldan)*, 226 B.R.

767, 772 (S.D.N.Y. 1998).  Courts have consistently found that  "fiduciary capacity" refers to

"fiduciary relationships that arise from express or technical trusts." *T & D Moravits & Co. v.*

*Munton (In re Munton)*, 352 B.R. 707, 712-13 (B.A.P. 9th Cir. 2006).  As one court has

observed, the "broad general definition of a fiduciary relationship, *i.e.*, a relationship of

confidence, trust, or good faith, is not relevant in the dischargeability context." *Munton*, 352

B.R. at 713.

Courts have long held that "an agreement which is essentially a commercial security

agreement in which the creditor has used trust language and imposed obligations on the debtor to

secure repayment of his loan does not create the fiduciary relationship required by Section

523(a)(4)." *Congress Fin. Corp. v. Levitan (In re Levitan)*, 46 B.R. 380, 385 (Bankr. E.D.N.Y.

1985).  This is a sensible rule, because "[i]t is the substance of a transaction, rather than the

labels assigned by the parties, which determines whether there is a fiduciary relationship for

bankruptcy purposes." *Barclays American/Bus. Credit, Inc. v. Long (In re Long)*, 774 F.2d 875,

878-79 (8th Cir. 1985).  As one court explained, the "consistent message" of courts has been:

> [A] party to an agreement should not be able to create a fiduciary relationship for
> purposes of discharge determination merely by inserting trust or fiduciary
> language in the agreement.  If a relationship is in reality a debtor-creditor
> relationship it should be recognized as such regardless of the label attached to it
> by the parties.

*Lipke*, 54 B.R. at 705-06 (holding that, under Section 523(a)(4), a fiduciary relationship was not

present between parties despite contractual language obligating the debtor to be a "trustee" with

respect  to certain funds).

    To the same effect, courts in this Circuit and elsewhere have considered contractual

agreements obligating a debtor to "hold in trust" proceeds for a creditor, and have held that the

use of such language in a credit agreement, without more, does not create a fiduciary obligation

for purposes of Section 523(a)(4).  For example, as the bankruptcy court in *In re Ladieu* found,

summary judgment was not warranted under Section 523(a)(4) where a contract required the

debtor to "fulfill its fiduciary duty, i.e., hold in trust" but did not otherwise bear the

characteristics of a fiduciary relationship.  *Rentrak Corp. v. Ladieu (In re Ladieu)*, 2011 WL

748566, at *3, 18 (Bankr. D. Vt. Feb. 24, 2011).  And as the bankruptcy court noted in *In re

Goldstein*, a creditor may not "create a fiduciary duty for purposes of Section 523(a)(4) simply

by throwing the word 'trust' into a loan or security document."  *Goldstein*, 2011 WL 5240335, at

*1.  *See Miles,* 5 B.R. at 460 (finding an agreement providing the debtor would hold certain

proceeds "in trust" did not signal the presence of a fiduciary relationship); *Matter of Chambers,*

23 B.R. 206, 208 (Bankr. W.D. Wis. 1982) (same).

33

As to the third element of a Section 523(a)(4) fiduciary defalcation claim, whether the debtor engaged in a fraud or fiduciary defalcation within the meaning of bankruptcy law, the Supreme Court has recently held that this requires "a culpable state of mind" or "one involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." *Bullock*, 133 S. Ct. at 1757.  In *Bullock,* the Supreme Court emphasized that the debtor's conduct must be intentional, and observed that intentional conduct may include "not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent." *Bullock*, 133 S. Ct. at 1759.  The Court held that where the debtor "consciously disregards" or is willfully blind to "a substantial and unjustifiable risk," his conduct will be sufficient to have breached a fiduciary duty for the purposes of defalcation under Section 523(a)(4).  *Id.*, 133 S. Ct. at 1759.  *See Rahman*, 2011 WL 1344495, at *5 (holding that defalcation "requires a showing of conscious misbehavior or extreme recklessness") (internal citation omitted).  And as this Court has noted, "At a minimum, a defalcation for purposes of Section 523(a)(4) must arise from conduct that justifies the substantial penalty of denial of dischargeability."  *Duncan*, 331 B.R. at 87.

*Whether VCI Has Shown that There Is No Genuine Dispute as to a Material Fact that an Express or Technical Trust Was Established*

The first element of a Section 523(a)(4) fiduciary defalcation claim is whether an express or technical trust was established.  To succeed on this claim, VCI must establish that there was an express or technical trust between VCI and Salim or, in this case, between VCI and Big Apple that was personally guaranteed by Salim.  And to succeed on this motion for summary judgment, VCI must establish that there is no genuine dispute as to a material fact as to the existence of such a trust.

34

VCI argues, in substance, that the language in the Wholesale Loan Agreement, which set out Big Apple's obligation to "hold in trust" the proceeds to be remitted to VCI, is sufficient to create an express trust. Salim does not contest the existence of the Wholesale Loan Agreement or its terms and responds, in substance, that he did not believe that he had a duty to inform VCI of Big Apple's business decisions, including decisions with respect to transactions that could affect Big Apple's ability to comply with its obligations to VCI.

The record shows that VCI provided financing for Big Apple's acquisition of vehicle inventory and that Big Apple agreed to make payments to VCI upon the sale of vehicles. *VW Credit,* 2012 WL 919386, at *1. The record further shows that the Wholesale Loan Agreement states that VCI would "hold in trust" the proceeds from those vehicle sales owed to VCI. As the District Court found, Big Apple "agreed . . . to remit to VCI the portion of each vehicle sale or lease which represented the monetary amount supplied by VCI to Big Apple under the loan," as well as to repay to VCI all funds loaned, with specified interest. *Id.* The record also shows that the Wholesale Loan Agreement provided VCI with a security interest in Big Apple's assets, including its "inventory of vehicles, chattels, and proceeds." *Id.*

In addition, the record shows that Salim agreed personally to guarantee Big Apple's obligations to VCI. As noted above, the Salim Guaranty extends to "any and all indebtedness, liability and obligations of every kind, nature and description, owed to [VCI] by [Big Apple]." *VW Credit,* 2012 WL 919386, at *4. And as the District Court held, by these guaranties, Salim and the other members of Big Apple agreed to be "jointly and severally" liable for the indebtedness. *VW Credit,* 2012 WL 919386, at *5.

But the record does not show that there is no genuine dispute as to a material fact that the

35

"character of the debt" between Big Apple and VCI, and guaranteed by Salim, was in the nature of a trust, rather than a secured debt supported by a guaranty. The language in the Wholesale Loan Agreement provides VCI the right *to request* that Big Apple "maintain a separate bank account into which all cash proceeds of such sales or other dispositions of each such Vehicle will be deposited," but does not make the segregation of the sale proceeds obligatory in the absence of a request by VCI. Adv. Pro. 13-01442, Dkt. 24, Affidavit of Crystal Jeffrey-Alexander ¶ 12. And the record does not show that VCI requested Big Apple to segregate the sale proceeds. Nor does the record show that Big Apple was otherwise required to segregate these funds, or that Big Apple in fact maintained a separate account for these purposes. And as many other courts have found, the use of trust nomenclature, including the phrase "hold in trust," without other factors present, does not create an express or technical trust.

In sum, VCI has not established that there is no genuine dispute as to a material fact that an express or technical trust existed between Big Apple and VCI, and VCI is not entitled to judgment as a matter of law on this element of its Section 523(a)(4) fiduciary defalcation claim.

### *Whether VCI Has Shown that There Is No Genuine Dispute as to a Material Fact that Salim Acted as a Fiduciary*

The second element of a Section 523(a)(4) fiduciary defalcation claim is whether the debtor acted as a fiduciary. To succeed on this claim, VCI must establish that Salim acted in a fiduciary capacity with respect to VCI. And to succeed on this motion for summary judgment, VCI must establish that there is no genuine dispute as to a material fact that Salim acted in this capacity.

VCI argues that Salim acted in a fiduciary capacity, based on the obligation of Big Apple to "hold" the proceeds of its vehicle sales "in trust" for VCI and the resulting establishment of a

trust between VCI and Big Apple.  VCI also notes that Salim personally guaranteed Big Apple's obligations, which is consistent with the existence of a fiduciary relationship between Salim and VCI.  Salim responds, in substance, that neither he nor Big Apple owed fiduciary duties to VCI, and that, as such, he was not obligated to report his business decisions to VCI, even when those decisions that could affect the disposition of VCI's collateral.

As discussed above, VCI has not shown that there is no genuine dispute as to a material fact as to the existence of an express or technical trust.  In the absence of an express or technical trust, VCI has also not established that there is no genuine dispute as to a material fact that Salim acted as a fiduciary, or owed a fiduciary obligation to VCI with respect to such a trust, or that Salim's obligations to VCI gave rise to a fiduciary obligation.

In sum, VCI has not established that there is no genuine dispute as to a material fact that Salim acted as a fiduciary to VCI, and VCI is not entitled to judgment as a matter of law on this element of its Section 523(a)(4) fiduciary defalcation claim.

*Whether VCI Has Shown that There Is No Genuine Dispute as to a Material Fact that Salim's Conduct Was Intentional*

The third element of a Section 523(a)(4) fiduciary defalcation claim is whether the alleged improper conduct was an intentional breach by the fiduciary.  To succeed on this claim, VCI must establish that Salim "consciously disregard[ed]" or was willfully blind to "a substantial and unjustifiable risk" of breaching a fiduciary duty.  And to succeed on this motion for summary judgment, VCI must establish that there is no genuine dispute as to a material fact that Salim's improper conduct was an intentional breach as a fiduciary.

VCI argues that Salim acted intentionally and in conscious breach of his fiduciary duty when he transferred the proceeds from Big Apple's vehicle sales to his mother and brother-in-

law.  VCI states that both the vehicles and the sale proceeds were its collateral.  VCI argues that by transferring these proceeds to his family members, Salim consciously and unjustifiably disregarded the risk of breaching his obligations to VCI which, it argues, were fiduciary obligations because those sale proceeds were to be "held in trust."

Salim does not dispute that he made substantial transfers to his family members, nor does he contest that he made those transfers while Big Apple had substantial obligations outstanding to VCI.  Rather, he responds, in substance, that he acted in good faith and within his discretion and business judgment as a member of Big Apple.  He also argues, in substance, that there is a genuine dispute as to a material fact as to whether he possessed the intent necessary to render the Judgment Debt nondischargeable.  Salim states that he held a genuine belief that when he transferred funds to his mother and brother-in-law, he was making legitimate business decisions to repay a loan from his mother that provided the capital to launch the Big Apple franchise in 2006, and to enter into a business venture to purchase used vehicles in Syria.  And Salim states that he believed that no creditor, including VCI, had priority over his mother because the proceeds from her loan facilitated his acquisition of the Big Apple dealership.  He also states that Samborski and Koeppel, the other members of Big Apple, had the same understanding.

As discussed above, VCI has not shown there is no genuine dispute as to a material fact as to the existence of an express or technical trust.  In the absence of an express or technical trust, VCI has also not established that there is no genuine dispute as to a material fact that Salim acted as a fiduciary, or owed a fiduciary obligation to VCI with respect to such a trust, or that Salim's obligations to VCI gave rise to a fiduciary obligation.

The record shows that Salim contractually agreed to guarantee the repayment of Big

Apple's obligations to VCI.  It also shows that those obligations were secured by Big Apple's assets, including its vehicle inventory and the proceeds from the sale out of that inventory.  The record further shows that Salim transferred funds to his mother and his brother-in-law while Big Apple was in debt to VCI under the terms of the Wholesale Loan Agreement, and that those transfers occurred at the same time that VCI's audit team was investigating Big Apple's sale out of trust.  And the record shows that the Capital Loan Agreement states that no prior liens exist on the property of Big Apple, such as a lien securing Big Apple's obligation to Salim's mother. That is, the record shows that, by transferring funds to his family members while Big Apple was in breach of its obligation to VCI, Salim may well have acted with conscious disregard of a substantial and unjustifiable risk that his conduct would impair or breach his contractual obligation to guarantee Big Apple's payments to VCI.  But the record does not show that Salim's obligation to VCI was a *fiduciary* obligation, and as a consequence, his conduct does not amount to a fiduciary defalcation.

In sum, VCI has not established that there is no genuine dispute as to a material fact that Salim acted intentionally to breach a fiduciary obligation, and VCI is not entitled to a judgment as a matter of law on this element of its Section 523(a)(4) fiduciary defalcation claim.

*   *   *

For all of these reasons, and based on the entire record, VCI's motion for summary judgment on its Bankruptcy Code Section 523(a)(4) claim that the Judgment Debt should not be discharged because it arose from a defalcation by a fiduciary is denied.

### The Elements of a Section 523(a)(4) Claim for Embezzlement

As noted above, Bankruptcy Code Section 523(a)(4) excludes from discharge debts that

arise from "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." For purposes of Section 523(a)(4), embezzlement is "the fraudulent appropriation of money by a person to whom such property had been entrusted or into whose hands it has lawfully come." *Gore v. Kressner (In re Kressner),* 155 B.R. 68, 74 (Bankr. S.D.N.Y. 1993). In order to establish that a debt should not be discharged because it is the product of embezzlement, a creditor must show that: "(1) the debtor rightfully possessed another's property; (2) the debtor appropriated the property for use other than the use for which the property was entrusted; and (3) the circumstances implied a fraudulent intent." *Northeast Remarketing Servs. v. Guthier (In re Guthier),* 2010 WL 1443989, at *6 (Bankr. N.D.N.Y. Apr. 9, 2010).

In considering the first and second elements of a claim arising under this Section, whether the debtor rightfully possessed the property of another and put that property to an improper use, and in particular in considering the requirement that the debtor possess the property of another, courts have found that "a mere lien or security interest does not rise to the level of ownership sufficient to support a claim under Section 523(a)(4)'s embezzlement provision." *Kraus Anderson Capital, Inc. v. Bradley (In re Bradley)*, 507 B.R. 192, 200 (B.A.P. 6th Cir. 2014) (collecting cases). As another court explained, "[a]s owner of the collateral, the debtor remained the owner of its proceeds, even though both the collateral and its proceeds were subject to a security interest. No person can embezzle from himself." *Deere & Co. v. Contella (In re Contella)*, 166 B.R. 26, 30 (Bankr. W.D.N.Y. 1994).

And in considering the third element of a Section 532(a)(4) embezzlement claim, whether the debtor acted with fraudulent intent, courts have noted that this element does not require a fiduciary relationship – but it does require an intent to defraud. *Guthier,* 2010 WL 1443989, at

*6. "Intent to defraud is a higher standard than the 'scienter' required under defalcation."

*Wisell*, 494 B.R. at 40.

### *Whether VCI Has Shown that There Is No Genuine Dispute as to a Material Fact that Salim Possessed VCI's Property*

The first element of a Section 523(a)(4) embezzlement claim is whether the debtor rightfully possessed the property of another.  To succeed on this claim, VCI must establish that Salim rightfully possessed its property.  And to succeed on this motion for summary judgment, VCI must establish that there is no genuine dispute as to a material fact as to this matter.

VCI argues, in substance, that the proceeds from Big Apple's vehicle sales due to VCI under the terms of the Wholesale Loan Agreement were its property because the proceeds from those sales were to be held "in trust" by Big Apple.  Salim responds, in substance, that these vehicle sales proceeds were VCI's collateral, but were not its property.

The record shows that VCI held a security interest in essentially all of Big Apple's assets. But the record does not show that there is no genuine dispute as to a material fact that VCI's collateral, and specifically Big Apple's vehicle sales proceeds, were also its property or that the Loan Agreements gave VCI more than a security interest in those funds.  Viewed another way, VCI has not shown that the Loan Agreements transformed VCI's collateral into its property. Many courts have reviewed similar contractual arrangements and reached the same conclusion. *See Bradley*, 507 B.R. at 200 (collecting cases).

In sum, VCI has not established that there is no genuine dispute as to a material fact that Salim possessed the property of VCI, and VCI is not entitled to judgment as a matter of law on this element of its Section 523(a)(4) embezzlement claim.

### *Whether VCI Has Shown that There Is No Genuine Dispute as to a Material Fact that Salim*

*Appropriated VCI's Property*

The second element of a Section 523(a)(4) embezzlement claim is whether the debtor

misappropriated the property of another.  To succeed on this claim, VCI must establish that

Salim put VCI's property to a use other than that for which he was authorized.  And to succeed

on this motion for summary judgment, VCI must establish that there is no genuine dispute as to a

material fact as to these matters.

 VCI argues, in substance, that Big Apple was authorized and required to pay the

proceeds of its vehicle sales directly to VCI, because those sale proceeds were to be held by Big

Apple "in trust" for it.  Salim responds, in substance, that he was permitted and entitled to make

business decisions on behalf of Big Apple with respect to the use of the sale proceeds, and that

the terms of the Loan Agreements did not prevent him from paying those proceeds to his family

members.

As discussed above, VCI has not shown that there is no genuine dispute as to a material

fact as to whether Salim possessed VCI's property rather than its collateral.  In the absence of

demonstrating that fact, VCI has also not established that there is no genuine dispute as to a

material fact as to whether Salim appropriated VCI's property and put it to a use other than that

for which he was authorized.

In sum, VCI has not established that there is no genuine dispute as to a material fact that

Salim appropriated VCI's property, and VCI is not entitled to judgment as a matter of law on this

element of its Section 523(a)(4) embezzlement claim.

*Whether VCI Has Shown that There Is No Genuine Dispute as to a Material Fact that Salim*
*Acted with Fraudulent Intent*

The third element of a Section 523(a)(4) embezzlement claim is whether the debtor had

intent to defraud.  To succeed on this claim, VCI must establish that Salim had the intent to defraud VCI.  And to succeed on this motion for summary judgment, VCI must establish that there is no genuine dispute as to a material fact as to Salim's intent.

VCI argues, in substance, that Salim's fraudulent intent may be inferred from his conduct.  VCI states that any business person who undertook obligations comparable to those undertaken by Salim, including his guaranty of Big Apple's obligations to VCI, and who acted contrary to those obligations, including by transferring funds to his family members, would necessarily have acted with fraudulent intent.

Salim responds, in substance, that he acted in good faith and without any intent to defraud VCI.  He states that he sincerely believed his mother held a first priority lien on Big Apple's assets because her loan permitted Big Apple to launch its business.  Salim also states that he had the authority to make business decisions on behalf of Big Apple without seeking the approval of VCI, and that ultimately, his decisions were made on the basis of reasonable business considerations in order to advance the business interests of Big Apple, not his personal interests or those of his family.

The record shows that Big Apple agreed to remit to VCI the proceeds from its vehicle sales, and that Salim personally guaranteed Big Apple's obligations to VCI.  *VW Credit,* 2012 WL 919386, at *1, 4.  And the record shows that Salim, as a member and majority equity owner of Big Apple, caused Big Apple to make transfers of its vehicle sales proceeds to his family members in amounts totaling $1,203,000.  The record also shows that Salim caused Big Apple to make those transfers while Big Apple had outstanding obligations to VCI, without VCI's authorization.

43

But the record does not show that there is no genuine dispute as to a material fact as to whether Salim undertook those actions with the intent to defraud VCI.  As other courts have found, fraudulent intent is rarely shown by direct evidence, and it may be inferred from the facts and circumstances.  But there is a difference between facts and circumstances that are *consistent with* an inference of fraudulent intent, and facts and circumstances that are sufficient *to establish* such intent.  Here, Salim states that his subjective intent was not to defraud VCI, and he has come forward with an alternative explanation for his actions in causing Big Apple to make payments to his mother and brother-in-law.

In sum, VCI has not established that there is no genuine dispute as to a material fact that Salim possessed the requisite intent to defraud VCI and VCI is not entitled to judgment as a matter of law on this element of its Section 523(a)(4) embezzlement claim.

*       *       *

For all of these reasons, and based on the entire record, VCI's motion for summary judgment on its Bankruptcy Code Section 523(a)(4) claim that the Judgment Debt should not be discharged because it arose from embezzlement is denied.

### *The Elements of a Section 523(a)(6) Claim for Willful and Malicious Injury*

Bankruptcy Code Section 523(a)(6) permits a creditor that has been injured by a debtor's willful and malicious act to exclude the resulting debt from the debtor's discharge.  In order to establish that a debt should not be discharged under Section 523(a)(6), the creditor must show that the debt at issue resulted from a "willful and malicious injury by the debtor to another entity or to the property of another entity."  11 U.S.C. § 523(a)(6).  That is, a creditor must establish three elements to succeed on a Section 523(a)(6) claim:  first, that the debtor acted willfully,

44

second, that the debtor acted maliciously, and third, that the debtor's willful and malicious actions caused injury to the creditor or its property.

"The terms 'willful' and 'malicious' are separate elements, and both elements must be satisfied . . . . The burden is on the [creditor] to show [each] by a preponderance of the evidence." *Rupert v. Krautheimer (In re Krautheimer),* 241 B.R. 330, 340-41 (Bankr. S.D.N.Y. 1999). "[I]n applying the standard, courts properly should look to tort law to distinguish the 'willful and malicious' from the merely 'reckless' act." *Wright v. Bujnowski (In re Wright),* 209 B.R. 276, 280 (E.D.N.Y. 1997). *See Rescuecom Corp. v. Khafaga (In re Khafaga*), 419 B.R. 539, 548-49 (Bankr. E.D.N.Y. 2009) (analyzing the development of the willful and malicious elements).

As to the first element of a Section 523(a)(6) claim, whether the debtor acted willfully, courts have observed that "'willful' in this context means 'deliberate or intentional.'" *Navistar Fin. Corp v. Stelluti (In re Stelluti)*, 94 F.3d 84, 87 (2d Cir. 1996). As the Supreme Court stated more than a century ago, "a [willful] disregard . . . which necessarily causes injury and is done intentionally, may be said to be done [willfully] and maliciously." *Tinker v. Colwell*, 193 U.S. 473, 487 (1904). More recently, the Supreme Court has observed that "'willful' in [Section 523](a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger,* 523 U.S. 57, 61 (1998). And the Supreme Court has explained that the necessary intent is similar to that required in the context of intentional torts, which "generally require that the actor intend 'the *consequences* of an act,' not simply 'the act itself.' Restatement (Second) of Torts § 8A, comment *a*, p. 15 (1964) (emphasis added)." *Geiger*, 523 U.S. at 61-62.

45

Other courts have similarly found that where a debtor's act is intentional and injury to another is certain, the "willfulness" element is established and the resulting debt is not dischargeable. For example, in *Stahl v. Gross (In re Gross)*, 288 B.R. 655 (Bankr. E.D.N.Y. 2003), the court observed that "[a]n intentional wrongful act that necessarily causes injury meets the willfulness standard under [*Geiger*]." *Stahl,* 288 B.R. at 662. And in *Sanger v. Busch (In re Busch),* 311 B.R. 657 (Bankr. N.D.N.Y. 2004), the court found that "a substantial certainty of harm" was sufficient to establish willfulness under Section 523(a)(6). *Sanger,* 311 B.R. at 669. *See Neshewat v. Salem (In re Salem),* 290 B.R. 479, 485-86 (S.D.N.Y. 2003) (affirming a finding of nondischargeability under Section 523(a)(6) where the debtor deliberately intended to cause injury); *Hough v. Margulies (In re Margulies)*, 2013 WL 2149610, at *3 (Bankr. S.D.N.Y. May 16, 2013) (explaining that intentional conduct includes "engag[ing] in conduct that was substantially certain to cause injury").

By contrast, debts arising from negligent or reckless conduct are not within the ambit of willfulness under Section 523(a)(6). *Geiger,* 523 U.S. at 64. As the court stated in *Khafaga*, "[*Geiger*] clarified the 'willful' prong by removing negligent or reckless conduct from the scope of [Section] 523(a)(6)." *Khafaga*, 419 B.R. at 549 (collecting cases).

The second element of a Section 523(a)(6) claim is whether the debtor acted maliciously in committing the injury. As defined by the Second Circuit, malice in this context encompasses both actual and constructive malice and "means wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will." *Stelluti,* 94 F.3d at 87-88. A malicious injury may "be found . . . in 'circumstances where it is evident that the conduct will cause injury to the plaintiff and under some aggravating circumstances to warrant the denial of discharge'" of

46

the debt. *Voyatzoglou v. Hambley (In re Hambley)*, 329 B.R. 382, 402 (Bankr. E.D.N.Y. 2005)

(quoting *Blankfort v. Bundy Am. Corp.* (*In re Blankfort)*, 217 B.R. 138, 144 (Bankr. S.D.N.Y.

1998)).

Courts recognize that malice may be implied from the circumstances. As one bankruptcy

court has observed, "implied or constructive malice may be found where the debtor's conduct

has 'no potential for economic gain or other benefit to the debtor, from which one could only

conclude that the debtor's motivation must have been to inflict harm upon the creditor.'" *Am.*

*Honda Fin. Corp. v. Ippolito (In re Ippolito)*, 2013 WL 828316, at *7 (Bankr. E.D.N.Y. Mar. 6,

2013) (quoting *In re Luppino*, 221 B.R. 693, 700 (Bankr. S.D.N.Y. 1998)). As the *Ippolito*

further court noted, "where a debtor's conduct has potential for economic gain or benefit, such as

a knowing breach of contract, a creditor must sufficiently plead aggravating circumstances to

satisfy § 523(a)(6)'s 'malice' requirement." *Ippolito*, 2013 WL 828316, at *7 (citing *Khafaga*,

419 B.R. at 550; *Luppino*, 221 B.R. at 700). Such "aggravating circumstances" should

"evidence[] conduct so reprehensible as to warrant denial of the 'fresh start' to which the 'honest

but unfortunate' debtor would normally be entitled under the Bankruptcy Code." *Blankfort*, 217

B.R. at 144. This requires careful consideration of the particular facts and circumstances, and

the determination of "whether sufficient aggravating circumstances exist is made by looking to

the totality of circumstances on a case-by-case basis." *Ippolito*, 2013 WL 828316, at *7.

Courts consistently find that a simple breach of contract, without more, is not sufficient

to satisfy the malice element of a Section 523(a)(6) claim. *Khafaga*, 419 B.R. at 550; *In re*

*Williams*, 337 F.3d 504, 509 (5th Cir. 2003); *XCO Int'l Inc. v. Pac. Scientific Co.,* 369 F.3d 998,

1002 (7th Cir. 2004). As the Supreme Court explained in *Geiger*, even a "knowing" breach of

contract may demonstrate intention only as to the act rather than to the resulting injury, and thus fall outside the reach of Section 523(a)(6). *Geiger,* 523 U.S. at 62. And "'[t]he mere failure to pay an obligation cannot be a willful and malicious injury in and of itself.'" *In re Marcella*, 463 B.R. 212, 220 (Bankr. D. Conn. 2011) (quoting *In re Buckallew,* 172 B.R. 927, 932 (Bankr. W.D. Mo. 1994)).

At the same time, a breach of contract that occurs in the context of other aggravating factors may well give rise to a viable claim under Section 523(a)(6). Such factors include the "failure to pay [a debt] from funds that the debtor had agreed specifically to earmark for that purpose . . . [which were] accessible and not otherwise encumbered . . . [and where the debtor] deliberately and intentionally refused to turn over the sale proceeds." *Alessi v. Alessi (In re Alessi),* 405 B.R. 65, 68 (Bankr. W.D.N.Y. 2009).

This rule is consistent with the notion that exceptions to discharge are not the norm, because if "every failure to pay a debt, even in the absence of intentionally tortious conduct" satisfied the willful and malicious standard, such a standard "would essentially render meaningless the protections afforded a debtor by the Bankruptcy Code, and vitiate its underlying purpose of providing relief to the 'honest but unfortunate debtor.'" *Marcella*, 463 B.R. at 220 (quoting *Grogan v. Garner*, 498 U.S. 286-87 (1991)).

Several courts have found that a sale out of trust is sufficient to establish willful and malicious injury to the creditor. For example, in *Ford Motor Credit Co. v. Owens,* 807 F.2d 1556 (11th Cir. 1987), the Eleventh Circuit affirmed a decision involving an automobile dealership financing agreement that included a contractual duty to "hold in trust" the sale proceeds for the creditor, where the lower court had found that the debtor's conduct precluded

discharge of the resulting debt under Section 523(a)(6). *Owens,* 807 F.2d at 1556. There, the dealership sold several vehicles and did not remit the proceeds to the creditor. *Owens,* 807 F.2d at 1557. The court found that the debtor "did not have any good faith reason for doing so and . . . [the dealership] presumptively knew that harm would result from conversion of a secured party's collateral" and as such, the sale out of trust established willful and malicious injury. *Owens,* 807 F.2d at 1559.

Another court, in finding a debt arising from a sale out of trust to be nondischargeable, explained that "[t]here is no evidence to support a finding that the failure to remit the funds was the result of any good faith belief on the Debtor's part that the Plaintiff had authorized the Debtors to sell the vehicles and retain the funds." *Redick v. Redick (In re Redick)*, 2007 WL 7143350, at *4 (Bankr. N.D. Ga. July 13, 2007). Other courts have reached similar conclusions in the context of a sale out of trust. *See, e.g., CBR, Inc. v. Naff (In re Naff),* 1997 WL 1088126, at *14-15 (Bankr. E.D. Va. 1997) (finding that a debt arising from the debtor's sale of automobiles "out of trust" was nondischargeable as a willful and malicious injury to the creditor); *Eaton v. Ford Motor Credit Co. (In re Eaton Auto. Group, Inc.)*, 2012 WL 3579644, at *4 (M.D. Tenn. Aug. 17, 2012) (concluding that "[a] debtor's sales out of trust creates a debt that is nondischargeable under § 523(a)(6)").

At the same time, other courts have rejected a uniform rule to the effect that a debt arising from a sale out of trust, without more, is nondischargeable, and have identified additional aggravating factors as relevant to establishing malicious intent. More than eighty years ago, the Supreme Court held that an automobile dealer's debts arising from proceeds of a vehicle sale that the debtor failed to remit to the creditor would not be excluded from discharge, and stated:

> There is no doubt that an act of conversion, if willful and malicious, is an injury to property within the scope of this exception . . . . But a willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without willfulness or malice. There may be an honest, but mistaken belief, engendered by a course of dealing, that powers have been enlarged or incapacities removed. In these and like cases, what is done is a tort, but not a willful and malicious one. . . . The discharge will prevail as against a showing of conversion without aggravated features.

*Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 332-33 (1934) (citations omitted).

In holding that Section 523(a)(6) requires more than a sale of inventory out of trust, courts have looked to additional factors including the debtor's conduct in response to a creditor's inquiry and the use of the proceeds for another purpose. For example, one court found that a debt arising from a sale out of trust was nondischargeable where the debtor "knew the automobiles were to be collateral for the bank loans" and still sold the vehicles, "retained the funds for other uses," and made "efforts to avoid the banks' representatives when they telephoned him about the loans." *Cent. Fid. Bank v. Higginbotham (In re Higginbotham)*, 117 B.R. 211, 215-16 (Bankr. E.D. Va. 1990). Another court held that a debt was nondischargeable where a debtor "understood that [the creditor] had superior ownership rights to the proceeds" and nevertheless withheld them on the basis of his view that he was "entitled to reimbursement of shipping and repair costs incurred" related to another sale. *Internet Auto. Grp. v. Shaffer (In re Shaffer)*, 305 B.R. 771, 777-78 (Bankr. D.S.C. 2004). In another example, a court held a debt to be nondischargeable after considering additional facts including the debtor's payments to other creditors, his responsibility for the dealership operations, and his personal guaranty of the dealership's obligations. *Matter of Smith*, 143 B.R. 284, 292 (Bankr. M.D. Ga. 1992).

The third element of a Section 523(a)(6) claim is whether the debtor's actions caused

injury to the creditor or its property.  *Guggenheim Capital, LLC v. Birnbaum (In re Birnbaum)*, 513 B.R. 788, 803 (Bankr. E.D.N.Y. 2014).  As one court has explained, "[t]he conduct complained of must be intended to or necessarily cause injury in order for the debt to be determined nondischargeable."  *Yash Raj Films (USA) v. Ahmed (In re Ahmed)*, 359 B.R. 34, 41 (Bankr. E.D.N.Y. 2005).

*Whether VCI Has Shown that There Is No Genuine Dispute as to a Material Fact that Salim Acted Willfully*

The first element of a Section 523(a)(6) claim is whether the debtor acted willfully.  To succeed on this claim, VCI must establish that Salim's conduct was willful, in that it was deliberate or was an intentional act that "necessarily cause[d] injury."  And to succeed on this motion for summary judgment, VCI must establish that there is no genuine dispute as to a material fact as to Salim's willful conduct.

VCI argues that Salim acted willfully to injure VCI when he participated in Big Apple's breach of its obligations to VCI through the sale out of trust and when he transferred the proceeds of those sales to his family members.  VCI also argues that Salim had knowledge of these matters because he personally guaranteed Big Apple's obligations to VCI and knew of VCI's security interest in the proceeds of the vehicle sales, both as a member of Big Apple and as a guarantor of Big Apple's agreements with VCI.  VCI states that it was denied access to Big Apple's premises and books and records, and that Salim participated in denying VCI access both to Big Apple's premises and to Big Apple's books and records that showed the sale out of trust of vehicles financed by VCI.  And VCI argues that Salim's transfer of Big Apple's funds to his family members within days of VCI's request to gain access to Big Apple's books and records also indicates that Salim acted willfully to injure VCI.

51

Salim responds that he had no intention to commit fraud, and that he made a business decision to repay a loan from his mother that was, he understood, secured by a first lien on Big Apple's assets, and to pursue a business venture with his brother-in-law to purchase used vehicles in Syria. He argues, in substance, that all of his actions were undertaken in good faith and within the scope of his authority and reasonable business judgment on behalf of Big Apple.

The record shows that Big Apple "sold 78 vehicles from its inventory, but did not remit payment, as required under the Wholesale Loan Agreement, to VCI." *VW Credit,* 2012 WL 919386, at *1. In addition, the record shows that Salim guaranteed Big Apple's performance of its obligations to VCI under the Loan Agreements. *Id.*

The record also shows that after Big Apple failed to remit payments to VCI, and while Big Apple was in breach of the Loan Agreements, Salim transferred Big Apple's funds to his mother and brother-in-law, and away from the reach of VCI. This was at odds with Big Apple's contractual obligations and Salim's personal guaranty, and necessarily impeded VCI's ability to recover the amounts that it was owed. The record further shows that Salim transferred these funds on March 14 and 15, 2011, at or about the same time that VCI's audit team sought access to Big Apple's premises and books and records to investigate the sale out of trust. And the record shows that just two days later, on March 17, 2011, VCI reported by letter to Salim and his partners that, having uncovered the sale out of trust, it had "accelerated payment of all amounts due under the Wholesale Loan Agreement and the Capital Loan Agreement," as permitted by the Loan Agreements. *Id.* These actions by Salim were deliberate and intentional.

In addition, the record shows that while Salim states that he believed his mother held a first lien on Big Apple's assets, his assertions are contradicted by the plain terms of the Loan

Agreements.  The Capital Loan Agreement provides that VCI holds a first lien security interest on Big Apple's assets.  Salim's transfers of funds to his family members necessarily hindered VCI's ability to recover the funds owed to it by Big Apple and, through his personal guaranty, by Salim.

The record further shows that Salim elected to cause Big Apple to repay one creditor, his mother, over another, VCI, despite its contractual obligation to do otherwise.  And the record shows that Salim elected to send Big Apple's funds outside of the United States to his brother-in-law to pursue a business venture to purchase used vehicles in Syria, to the detriment of VCI. These actions, too, by Salim were deliberate and intentional.

Finally, the record shows that Salim's actions were substantially certain to cause injury to VCI.  The record shows that Salim was aware of Big Apple's and his contractual obligations and entered into transactions that were inconsistent with those obligations.  The record also shows that Salim took actions that, under the terms of the Loan Agreements and his own guaranty, would necessarily cause injury to VCI.  Here too, Salim's actions were deliberate and intentional, and Salim knew that his actions would necessarily injure VCI.

In sum, VCI has established that there is no genuine dispute as to a material fact that Salim's actions were willful, in that they were intentional actions that "necessarily cause[d] injury" to VCI, and VCI is entitled to summary judgment on this element of its Section 523(a)(6) claim.

### *Whether VCI Has Shown that There Is No Genuine Dispute as to a Material Fact that Salim Acted Maliciously*

The second element of a Section 523(a)(6) claim is whether the debtor acted maliciously. To succeed on this claim, VCI must establish that Salim's conduct was malicious, or without just

cause or excuse.  And to succeed on this motion for summary judgment, VCI must establish that there is no genuine dispute as to a material fact as to Salim's malicious conduct.

VCI argues that Salim participated in Big Apple's sale out of trust and that his actions lacked justification.  In addition, VCI argues that Salim's conduct demonstrates sufficient aggravating factors to establish that there is no genuine dispute as to a material fact that he acted with malice or without justification.  VCI also argues that Salim and the other members of Big Apple further breached their obligations to VCI by denying VCI access to Big Apple's premises and its books and records when VCI attempted to investigate whether there had been a sale out of trust.  And VCI states that Salim's conduct in transferring funds to his family members while Big Apple had outstanding obligations to VCI, which were personally guaranteed by Salim, was so plainly unjustified as to satisfy the standard of maliciousness.

Salim responds that he did not intend to cause harm to VCI.  Salim states that his actions amount to no more than a breach of contract and were undertaken in the good faith belief that they were business judgments that he was entitled to make on behalf of Big Apple.  Salim argues, in substance, that he acted in good faith, and that his conduct is not "so reprehensible as to warrant denial of the 'fresh start' to which the 'honest but unfortunate' debtor would normally be entitled under the Bankruptcy Code." *Blankfort*, 217 B.R. at 144.  Salim also denies that he or other Big Apple members intentionally hindered VCI's investigations of Big Apple's premises or books and records.  Rather, Salim argues, in substance, that his conduct was justified because he acted only to benefit Big Apple, not to harm VCI, and that he believed that his decision to repay another creditor had the potential for economic gain or other benefit to Big Apple.

As described above, the record shows that Big Apple breached its contractual obligations to VCI under the Loan Agreements by failing to remit the proceeds of its vehicle sales.  And the record shows that Salim personally guaranteed Big Apple's obligations to VCI.  The record also shows that, rather than remit these sales proceeds to VCI, Salim transferred Big Apple's funds to his mother and brother-in-law.  And the record shows that Salim's transfers of Big Apple's funds to his family members were inconsistent with Big Apple's and Salim's obligations to VCI, and exacerbated the harm to VCI resulting from Big Apple's sale out of trust.

The record also shows that Salim's assertion that Big Apple's debt to his mother was senior to Big Apple's obligations to VCI is contradicted by the plain terms of the Loan Agreements and inconsistent with the Salim Guaranty.  And the record does not show that Big Apple benefitted when Salim caused Big Apple to make payments to his mother to repay her loan, or to Salim's brother-in-law in connection with a business venture to purchase used vehicles in Syria, before satisfying Big Apple's obligations to VCI.  The record also shows that Salim's transfers to his family members coincided with VCI's investigation of Big Apple's sale out of trust, and were made just before VCI gave notice to Big Apple that it was accelerating payment of the amounts due under the Loan Agreements.  That is, the record shows that Salim's conduct did not provide a benefit to Big Apple, and was not justified under the circumstances.

In sum, VCI has established that there is no genuine dispute as to a material fact that Salim's conduct was unjustified and maliciously caused injury to VCI, and VCI is entitled to summary judgment on this element of its Section 523(a)(6) claim.

*Whether VCI Has Shown that There Is No Genuine Dispute as to a Material Fact that*
*Salim's Willful and Malicious Acts Injured VCI or Its Property*

The third element of a Section 523(a)(6) claim is whether the debtor's willful and

malicious conduct caused an injury to the creditor or the creditor's property. To succeed on this claim, VCI must establish that Salim's willful and malicious acts injured VCI or its property. And to succeed on this motion for summary judgment, VCI must establish that there is no genuine dispute as to a material fact that Salim's willful and malicious acts caused such an injury.

VCI argues that it has been injured by Salim's conduct to the full extent of the Judgment Debt. Salim responds, in substance, that VCI has already recovered as a creditor in Big Apple's bankruptcy proceedings for its losses caused by Big Apple's sale out of trust.

The record shows that the District Court granted summary judgment in favor of VCI and against Salim, Koeppel, and Samborski and awarded VCI the full amount of damages that it sought, comprised of sums due under the Wholesale Loan Agreement, interest, and "cost[s] of enforcing the terms . . . including reasonable attorneys' fees" and expenses associated with "protect[ing] [VCI's] collateral." *VW Credit*, 2012 WL 5964393, at *2. The record also shows that in the District Court Action, VCI accounted for and offset the amounts that it received as a creditor in Big Apple's bankruptcy. *Id*. This is appropriate, because VCI is entitled only to a single recovery. Taking that into account, the District Court concluded that Salim, Koeppel, and Samborski were jointly and severally liable to VCI for $1,146,758.11, and this is the measure of VCI's injury. *VW Credit*, 2012 WL 5964393, at *6.

In sum, VCI has established that there is no genuine dispute as to a material fact that Salim's willful and malicious conduct injured VCI in the amount of the Judgment Debt, and VCI is entitled to summary judgment as to this element of its Section 523(a)(6) claim.

*Whether VCI Has Shown that Its Attorneys' Fees and Costs and Expenses To Protect Its Collateral Should Be Included in the Nondischargeable Judgment Debt*

56

VCI argues that a finding of nondischargeability of the Judgment Debt should reach not only the amounts that the District Court found owing under the Loan Agreements, but also the sums awarded by the District Court as attorneys' fees and costs and VCI's expenses associated with protecting its collateral.  Salim responds, in substance, that the law cited by VCI, including the Supreme Court's decision in *Cohen v. de la Cruz,* 523 U.S. 213 (1998), does not require this result.

In *Cohen v. de la Cruz*, the Supreme Court considered a nondischargeability claim arising under Bankruptcy Code Section 523(a)(2)(A), which addresses the nondischargeability of debts "for money, property, services, or . . . credit, to the extent obtained by (A) false pretenses, a false representation, or actual fraud."  11 U.S.C. § 523(a)(2)(A).  The Supreme Court concluded that a debt that is nondischargeable under Section 523(a) should include the full amount associated with the conduct at issue, including "debt arising from" or "debt on account of" that conduct.  *Cohen,* 523 U.S. at 220-21.  The Supreme Court did not limit this holding to Section 523(a)(2)(A).  This is consistent with prior Supreme Court decisions on similar issues, where the Court has noted that the "broad language" of the Bankruptcy Code "suggests that all debts arising out of the conduct specified in § [523] should be excepted from discharge."  *Brown v. Felsen*, 442 U.S. 127, 138 (1979).

In applying *Cohen*, the lower courts have confirmed that a debt that is nondischargeable under Section 523 should encompass the amounts "arising from" and "on account of" the initial obligation.  As one court has explained, the Supreme Court "emphasized that 'any debt' referred to 'full liability' and the focus was on making the creditor 'whole.'"  *Roussos v. Michaelides (In re Roussos)*, 251 B.R. 86, 94 (B.A.P. 9th Cir. 2000), *aff'd*, 33 F. App'x 365 (9th Cir. 2002)

(quoting *Cohen*, 523 U.S. at 223).

Bankruptcy courts have consistently applied *Cohen* to nondischargeable debts under Section 523(a)(6).  For example, as one court explained, "*Cohen* compels the conclusion that an award of attorneys' fees is nondischargeable under Section 523(a)(6) where those fees were incurred as a result of conduct giving rise to the nondischargeable debt."  *In re Kovler*, 249 B.R. 238, 262 (Bankr. S.D.N.Y. 2000).  As another court observed, "When a debt is declared non-dischargeable under [Section] 523(a)(6), it is *all* of the losses suffered as a result of the egregious conduct, that must be declared non-dischargeable, if such losses are allowable under non-bankruptcy law."  *In re Davis*, 2010 WL 1930944, at *5 (Bankr. W.D.N.Y. May 12, 2010) (citing *In re Behn*, 245 B.R. 444 (Bankr. W.D.N.Y. 2000)).  *See Wisell*, 494 B.R. at 43; *Luppino*, 221 B.R. at 703.

Here, the record shows that the District Court found that pursuant to the Loan Agreements, VCI was entitled to recover its attorneys' fees and costs, as well as its expenses to protect its collateral.  The District Court included an award of those amounts in the Judgment Debt.  The record also shows that it is appropriate to include these amounts in the nondischargeable debt in order to account for the full value of VCI's losses from Salim's willful and malicious conduct.  As a result, VCI's attorneys' fees and costs and its expenses to protect its collateral should be included in the nondischargeable debt.

In sum, VCI has established that there is no genuine dispute as to a material fact that its attorneys' fees and costs and expenses to protect its collateral should be included in the nondischargeable Judgment Debt or, viewed another way, that the full amount of the Judgment Debt is nondischargeable under Section 523(a)(6), and VCI is entitled to judgment as a matter of

58

law as to the amount of the nondischargeable debt.

*              *              *

For all of these reasons, and based on the entire record, VCI's motion for summary judgment on its Bankruptcy Code Section 523(a)(6) claim that the Judgment Debt, including its attorneys' fees and costs and expenses to protect its collateral, should not be discharged because it arose from a willful and malicious injury by Salim to VCI is granted.

<strong><u>Conclusion</u></strong>

Based on the entire record, and for all the reasons reflected in the record and as set forth in this Memorandum Decision, the Motion for Summary Judgment of VW Credit, Inc. is granted in part and denied in part.  The Motion is granted to the extent that VCI has established that it is entitled to summary judgment on its claim under Bankruptcy Code Section 523(a)(6) that the Judgment Debt owed by Salim to VCI, including VCI's attorneys' fees and costs and expenses to protect its collateral, is not dischargeable in this Chapter 7 bankruptcy case because it arose from a willful and malicious injury by Salim to VCI or its property.  In all other respects, the Motion for Summary Judgment is denied.  An order in accordance with this Memorandum Decision will be entered simultaneously herewith.



**Dated: Brooklyn, New York**
**March 16, 2015**

**Elizabeth S. Stong**
**United States Bankruptcy Judge**